UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 25-1341

SECTION "G" (5)


CONNOR PULLIAM, ET AL


VERSUS

BANANA BLOSSOM THAI CAFE, LLC, ET AL


        Deposition of

RATTANASAK CHOTIKARNKUL given in the

above-entitled cause, before Lori L. Marino,

Certified Shorthand Reporter, in and for the

State of Louisiana, via Zoom videoconference

on Tuesday, May 26, 2026, commencing at

4:04 PM.


REPORTED BY:  LORI L. MARINO
              CERTIFIED COURT REPORTER
              STATE OF LOUISIANA

Electronically signed by Lori Marino (601-401-997-8989)                                    b6b7b766-6591-48ca-901b-8894d0657f01

Page 2

APPEARANCES:

(ALL PARTICIPANTS PRESENT VIA ZOOM
VIDEOCONFERENCE:)

MOST & ASSOCIATES
201 ST. CHARLES AVENUE, SUITE 2500
NEW ORLEANS, LOUISIANA  70170
TELEPHONE:  (504) 500-7974

BY:  HOPE A. PHELPS, ESQ.
hopeaphelps@outlook.com

         AND

KENNETH C. BORDES, ATTORNEY AT LAW, LLC
3914 CANAL STREET
NEW ORLEANS, LOUISIANA  70119
TELEPHONE:  (504) 588-2700

BY:  KENNETH C. BORDES, ESQ.
kcb@kennethbordes.com
REPRESENTING THE PLAINTIFF

BUTLER MCDONALD LAW FIRM
2450 SEVERN AVENUE, SUITE 400
METAIRIE, LOUISIANA  70001
TELEPHONE:  (504) 407-2101

BY:  JOHN D. PEREZ, ESQ.
jperez@bmcdlaw.com
REPRESENTING THE DEFENDANT

ALSO PRESENT:  CONNOR PULLIAM
               ASSATA SIMPSON
               KATHERINE TEMPLETON

Page 3

W I T N E S S   I N D E X

RATTANASAK CHOTIKARNKUL
500 9TH STREET
GRETNA, LOUISIANA  70053

TITLE                                              1

APPEARANCES                                        2

INDEX                                              3

AGREEMENT OF COUNSEL                               4

EXAMINATION BY MS. PHELPS                          5

REPORTER'S CERTIFICATE                            22

EXHIBIT INDEX

EXHIBIT A - NOTICE OF DEPOSITION                   6

Page 4

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of RATTANASAK CHOTIKARNKUL is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of signing, sealing and certification are hereby waived. The party responsible for service of the discovery material shall retain the original.

That all objections, save those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

                *  *  *  *  *  *  *  *

LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 5

RATTANASAK CHOTIKARNKUL, having been first duly sworn was examined and testified on his oath as follows:

MS. PHELPS:

John, can we stipulate that this deposition was properly noticed, and the court reporter is duly qualified?

MR. PEREZ:

Sure.  So stipulated.

EXAMINATION

BY MS. PHELPS:

Q    Jimmy, so that we can keep this shorter, did the answers you gave me earlier for the company Banana Blossom Thai Cafe, LLC, do those answers apply equally to you as an individual?

A    Yes.

Q    Just wanting to make sure of that so I don't repeat the same questions we just went through.  Can you see this document on the screen?

A    Yes.

Q    This is just the notice of deposition for this individual deposition today, correct?

A    Yes.

Page 6

MS. PHELPS:

We'll attach this as Exhibit A.

BY MS. PHELPS:

Q    Is there anything different from the prior deposition?  Is there anyone else in the room with you, or do you have any documents with you now?

A    No.

Q    Did you do anything extra to prepare for this individual deposition?

A    No, I do not.

Q    What is your highest level of education?

A    Bachelor's degree.

Q    And what's the degree in and from where?

A    Hotel management.

Q    And what school was that from?

A    Actually, a school in Bangkok, and then, I continued my degree in New Orleans.

Q    Where did you continue it in New Orleans?

A    Delgado.

Q    Other than being the current owner and manager of Banana Blossom, do you have any

Page 7

other jobs or positions that you hold?

A   No, just this.

Q   Before Banana Blossom, had you worked
at or owned any other restaurants?

A   This is my first business.  I did
work at other restaurants before.

Q   What other restaurants have you
worked at?

A   Little Tokyo.

Q   The Little Tokyo in Metairie?

A   It was in Mid-City.

Q   Mid-City, okay.  And what was your
position there?

A   I was a server.

Q   How long were you a server there?

A   Three years.

Q   Did you work anywhere else other than
there?

A   I work at Sukho Thai.

Q   How long did you work there?

A   Three years also.

Q   Anywhere else other than those two?

A   Two Sisters.

Q   At Sukho Thai, what was your role
there?

A    I was a server.

Q    Do you have an ownership interest in any restaurants other than Banana Blossom?

A    No.

Q    Did you work with anyone else to open Banana Blossom?

A    To open Banana Blossom?

Q    Yes.

A    No, just me.

Q    We heard from your past accountant about a possible business venture, a restaurant other than Banana Blossom that you had attempted.  Was there another restaurant or business venture that failed or never came to fruition?

A    Yeah.  That was a partnership with BRG.  It only last for a year and the half, I think, yeah.

Q    What was it called?

A    Cho Thai.

Q    Who did you say it was with?

A    BRG.  It's a Besh Restaurant Group.

Q    What is it, the Besh Restaurant Group?

A    Besh, like John Besh.

Electronically signed by Lori Marino (601-401-997-8989)

Q    Okay, I understand, yeah.  Why did that fall through?

A    I think the numbers didn't work out. So they decided to close.

Q    Do you remember what the numbers were?

A    I do not remember.  I didn't handle anything over there.

Q    Would you say that the restaurant industry is a risky business?  It can be hard to make a profit?

A    Yes.

Q    Banana Blossom has been very successful though, right?

A    It has been good.

Q    We already went through some numbers before, but off the top of your head, what's about the average income and profits for Banana Blossom per year?

A    I have to figure.  I can't say.

Q    But you've never had a year where you've been in the red?

A    No.

Q    We talked in the last deposition about, you know, other restaurant owners who

are friends or colleagues maybe, who you've talked to.  Do you know how much any other restaurant owners make in this area?

A    I don't ask personal financial questions.

Q    Okay.

A    Usually, just idea, you know, like problem.

Q    Okay.  On May 5, 2025, did you call the parents of Connor Pulliam's best friend?

A    I did, because I know the family.

Q    What are their names?

A    Chrissy and Garrett.

Q    You said they're family friends or --

A    Yes.

Q    They're regular -- they are regulars at Banana Blossom?

A    They're regular, and you know, I know the family.

Q    Why did you call them?

A    Because I just need to talk to them. I need to, you know, like ask them some questions.

Q    What kind of questions were you asking them?

Page 11

A    Just like, you know, conversation.  I was attacked by Connor and just have some opinions.

Q    What kind of opinions did they give you?

A    They just -- they just tell the truth.  They know him since he was little, you know.  Nothing very like -- because I don't really like know the people, you know.

Q    What did you tell them about Connor?

A    I just told them like I got attacked, you know.  I just want -- that's it.  That was my point.

Q    When you say attacked, do you mean verbally or physically?

A    Verbally.

Q    Did you tell them that Connor hadn't been acting right at work?

A    Yeah, I did mention it.

Q    When you said that he hadn't been acting right, what did you mean?  Like how had he been acting?

A    Just the way he speak to me and the way how he approach like at the meeting, you know.

Q    Did you suggest to them that Connor may be mentally ill?

A    I never say that.

Q    Did you have any reason to believe that Connor was mentally ill or not acting right in that sense?

A    I never say that.  I never think so. I think young people, they handle situation differently.

Q    Did you both talk to them on the phone and go to their house in person?

A    Yeah, I have their number in my phone.

Q    You also went to their home; is that right?

A    Yes, I did.

Q    How long did you stay and talk to them about Connor?

A    I stay for a few hours.  We talk about other things too, because we know each other.  We don't just --

Q    Okay.  After the May 2nd meeting, did you talk to anyone else about Connor?

A    No, I did not.  Mostly just inside work.

Q    Did you talk to anyone about any of the other employees or just Connor?

A    Just Connor.

Q    Why to only him and not the other employees who participated in the discussion?

A    Because other than meeting, they just don't talk to me, and that was the only time that we had conversation.

Q    About how much money is in Banana Blossom's accounts presently?

A    I don't know by heart, and I refuse to answer the questions.

Q    Why do you refuse to answer the question?

A    Like I said, I don't like talk about like financials to other people.

Q    Okay.  You understand this is a lawsuit, and you're sworn under oath today as if you're in a court before a judge and a jury, correct?

A    Yes.

Q    So I'm just going to ask you again, how much money is in Banana Blossom's accounts presently?

A    Probably like --

Page 14

MR. PEREZ:

He said he didn't know

previously.

MS. PHELPS:

Okay.  Okay.

BY MS. PHELPS:

Q    Since this lawsuit, you testified earlier that you had -- Banana Blossom doesn't save tip logs and time sheets, and you're the acting manager, as well currently, correct?

A    Yes.

Q    Since this lawsuit, have you kept a record of employees's weekly hours and the tip logs and weekly schedules?

A    Yes, I do.

Q    And that's different from the process from before this lawsuit?

A    It's the same format.

Q    Same format, but now, you save those records, correct?

A    Well, usually, I would -- like I said, I save like maybe, a month, and then, you know, I just have like a new like file thing.

Q    So, for example, the tip log

Electronically signed by Lori Marino (601-401-997-8989)                    b6b7b766-6591-48ca-901b-8894d0657f01

Page 15

notebooks, do you still have the tip log notebooks from June of last year?

A    No, I do not have them.

Q    And that's because you still throw them out, correct?

A    Yeah, because I only put a number in the logbooks.

Q    What about -- are the paychecks still biweekly?

A    Yes.

Q    But are you recording employees's hours on a weekly basis and paying overtime now?

A    Yes.  And we don't schedule people -- we schedule staff like 30 hours per person. So it never exceeds.

Q    So are you doing something now to make sure employees can't cover?

A    That's what we been doing.

Q    Wait.  Sorry.  Are you doing something now to prevent employees from covering or picking up shifts and working more than 40 hours, or is it possible that --

A    No.  It's just everybody like part-time.  So we need just more staff to fill

in the shift.

Q   So you have hired more staff since this lawsuit?

A   It's the same amount, but everybody has -- like I said, everybody have like a part-time job, because of the school schedule.

Q   How do you know an employee is not picking up shifts and totaling more than 40 hours in a week?

A   If there was excess 40, they have to come -- they have to let me know that they work more than 40.

Q   Okay.

A   So I can, you know, like make the payroll accordingly.

Q   And you've told these employees that now; that they have to let you know when they're at 40 or more hours?

A   Yeah.  I have a meeting and address about like, you know, what's going on and all that.

Q   Okay.  Okay.

MS. PHELPS:

I'm attaching the notice of deposition as Exhibit A.  I'm going

Page 17

to show you a document.

BY MS. PHELPS:

Q   Can you see the document on the screen?

A   Yes.

Q   Have you seen this document before?

A   No, I have not.

Q   This is a copy of our plaintiffs's settlement proposal that was sent to your attorneys on April 22, 2026.  Were you aware that the plaintiffs had sent a settlement proposal?

A   No.  First time I see this.

Q   So you understand that this would have avoided the need for a deposition if we had been able to reach a settlement, correct?

A   Yes.

Q   So you see that the plaintiffs proposed a settlement in the amount of about 1.5 million?  Is this your first time hearing about this settlement proposal?

A   Yeah, first time I see this.

Q   I'll give you a chance to look at it here in the columns, but that 1.5 million offer number was based on these ranges of

calculation for overtime, wage theft, tip pool violations and the credit card fee deductions.

A    Okay.  So what was the question again?

Q    Well, since you haven't had an opportunity to look at the settlement proposal before, I wanted you to have time to see it and look at the way that these numbers were calculated.

A    Yeah, I'm going to have my attorney to respond to this one.

Q    Okay.  Okay.  But at this time, you don't have any reason to believe that these calculations are wrong, or do you want to talk to your attorney first?  Is that what you're saying?

A    Yes.

        MR. PEREZ:

            Off record.

        MS. PHELPS:

            Okay, we can go off record.

        (Off-the-record discussion.)

BY MS. PHELPS:

Q    Jimmy, do you still have the same answer about if you haven't seen the proposal

Page 19

before?  Have you gone over it at all?

A    This is the first time I see this.

Q    Okay.  I'm going to show you another document.  Can you see the document on the screen?

A    Yes.

Q    Have you seen this document before?

A    No, I have not.

Q    Okay, this an order from the court from Federal Magistrate Judge Michael North issued on May 22, 2026.  I'll represent that to you.  Were you aware that there was a settlement conference scheduled for May 19, 2026 at 1:00 PM?

A    No, I do not know.  I was -- no, I was -- I didn't know the time and date.

Q    Okay.

A    I get in touch with John like yesterday, I think.

Q    Per this order on May 22nd, the Court has noted that regarding the scheduled conference, defendant, you and Banana Blossom, violated every requirement described above resulting in the undersigned's decision to cancel the settlement conference.  Were you

aware that the settlement conference was canceled for those violations?

A    I never get in touch with anybody and the first time I see this letter.

Q    Okay.  This last line, accordingly counsel for defendant shall appear before the Court on June 11, 2026 at 11:00 AM to show cause why they shouldn't be sanctioned under Federal Rule of Civil Procedure 16(f) for failing to comply with this Court's order scheduling a settlement conference.  Do you understand that your attorneys are being ordered to appear in court on June 11th to explain why they should not be sanctioned?

A    This is the first time I hear about this.

Q    Will you be present for this hearing on June 11th?

A    What time?

Q    June 11th at 11:00 AM.

A    I should be able to.

Q    Okay.

MS. PHELPS:

John, are you able to agree to be present at this hearing with

Page 21

Mr. Jimmy?

MR. PEREZ:

Yes, Mark and I will be there.

MS. PHELPS:

I won't be attaching that as an exhibit.  Those are all my questions for you.  I will hand you off to John now.  Thank you.  Thank you for your time today.

THE WITNESS:

Thank you.

MS. PHELPS:

John, do you have any questions?

MR. PEREZ:

No, thanks.

(Whereupon, the deposition was concluded at 4:33 PM.)

Page 22

C E R T I F I C A T E

I, LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that RATTANASAK CHOTIKARNKUL, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 21 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 1st day of June, 2026.

*Lori L. Marino*

LORI L. MARINO, CCR
CCR #87069
STATE OF LOUISIANA