UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 25-1341

SECTION "G" (5)


CONNOR PULLIAM, ET AL


VERSUS

BANANA BLOSSOM THAI CAFE, LLC, ET AL


30(b)(6) deposition of BANANA BLOSSOM THAI CAFE, LLC THROUGH ITS REPRESENTATIVE RATTANASAK CHOTIKARNKUL given in the above-entitled cause, before Lori L. Marino, Certified Shorthand Reporter, in and for the State of Louisiana, via Zoom videoconference on Tuesday, May 26, 2026, commencing at 1:05 PM.


REPORTED BY:   LORI L. MARINO
               CERTIFIED COURT REPORTER
               STATE OF LOUISIANA

APPEARANCES:

(ALL PARTICIPANTS PRESENT VIA ZOOM VIDEOCONFERENCE:)

MOST & ASSOCIATES
201 ST. CHARLES AVENUE, SUITE 2500
NEW ORLEANS, LOUISIANA   70170
TELEPHONE:   (504) 500-7974

BY:   HOPE A. PHELPS, ESQ.
hopeaphelps@outlook.com

          AND

KENNETH C. BORDES, ATTORNEY AT LAW, LLC
3914 CANAL STREET
NEW ORLEANS, LOUISIANA   70119
TELEPHONE:   (504) 588-2700

BY:   KENNETH C. BORDES, ESQ.
kcb@kennethbordes.com
REPRESENTING THE PLAINTIFF

BUTLER MCDONALD LAW FIRM
2450 SEVERN AVENUE, SUITE 400
METAIRIE, LOUISIANA   70001
TELEPHONE:   (504) 407-2101

BY:   JOHN D. PEREZ, ESQ.
jperez@bmcdlaw.com
REPRESENTING THE DEFENDANT

ALSO PRESENT:   CONNOR PULLIAM
                ASSATA SIMPSON

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 3

W I T N E S S    I N D E X

RATTANASAK CHOTIKARNKUL
500 9TH STREET
GRETNA, LOUISIANA  70053

TITLE                                              1

APPEARANCES                                        2

WITNESS INDEX                                      3

EXHIBIT INDEX                                      4-5

AGREEMENT OF COUNSEL                               6

EXAMINATION BY MS. PHELPS                          7

REPORTER'S CERTIFICATE                             94

Page 4

EXHIBIT INDEX

EXHIBIT A - NOTICE OF DEPOSITION            11

EXHIBIT B - 7/24 PAYROLL                    24

EXHIBIT C - 2020 BALANCE SHEET              28

EXHIBIT D - 2021 BALANCE SHEET              30

EXHIBIT E - 2022 BALANCE SHEET              31

EXHIBIT F - 2023 BALANCE SHEET              32

EXHIBIT G - 2023 TRANSACTION DETAIL         37

EXHIBIT H - 7/24 PAYCHECK STUBS             45

EXHIBIT I - KATHERINE TEMPLETON             48
            PAYCHECK STUB

EXHIBIT J - 2023 SCHEDULE K-1 FORM          48

EXHIBIT K - 2020 SCHEDULE K-1 FORM          49

EXHIBIT L - TIP LOG BOOK                    57

EXHIBIT M - DOCUMENT FROM CONNOR PULLIAM    67
            ON 4/11/25

EXHIBIT N - SCREENSHOT                      71

EXHIBIT O - PAY SCHEDULE COMPARISON         72

EXHIBIT P - SCREENSHOT                      75

EXHIBIT Q - SCREENSHOT                      77

EXHIBIT R - SCREENSHOT                      79

EXHIBIT S - SCREENSHOT                      80

EXHIBIT T - 5/9/25 LETTER                   82

EXHIBIT U - DEFENDANT'S FIRST AMENDED       90
            ANSWER AND AFFIRMATIVE DEFENSES

EXHIBIT INDEX (CONTINUED)

EXHIBIT V – DEFENDANT'S RESPONSES TO        91
             PLAINTIFF'S FIRST SET OF
             DISCOVERY RESPONSES

EXHIBIT W – AFFIDAVIT OF VERIFICATION       93

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of RATTANASAK CHOTIKARNKUL is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of signing, sealing and certification are hereby waived. The party responsible for service of the discovery material shall retain the original.

That all objections, save those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * * * * *

LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 7

RATTANASAK CHOTIKARNKUL, having been first duly sworn was examined and testified on his oath as follows:

MS. PHELPS:

Can we stipulate that the deposition was properly noticed, and the court reporter is duly qualified, John and Jimmy?

MR. PEREZ:

I'm sorry.  There's a delay.  So stipulated.

MS. PHELPS:

Can we stipulate that the deposition has been properly noticed, and the court reporter is qualified?

MR. BORDES:

I think he said so stipulated.

EXAMINATION

BY MS. PHELPS:

Q   Jimmy, could you the state your full legal name for the court record?

A   Rattanasak Chotikarnkul.

Q   Could you spell that for us?

A   R-A-T-T-A-N-A-S-A-K, and the last name is C-H-O-T-I-K-A-R-N-K-U-L.

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Q   And you go by Jimmy Cho; is that correct?

A   Yes.

Q   Do you know what case you're here for today?

A   Yes.

Q   Do you understand that this is the 30(b)(6) corporate deposition, and that you're the witness that Banana Blossom Thai Cafe, LLC has designated to speak for it on a number of topics?

A   Yes.

Q   And you're aware that you've been made available to represent the knowledge of Banana Blossom on those topics, correct?

A   Yes.

Q   And you realize you are the designated representative of Banana Blossom for me to question you?  Do you understand?

A   Yes.

Q   So when I'm asking a question of you, I'm really asking a question of Banana Blossom.  Do you understand that?

A   Yes, I do.

Q   When you give an answer, you're

Page 9

giving the answer of Banana Blossom.  Do you understand that?

A    Yes, I do.

Q    If I say you during this deposition, I am referring to Banana Blossom.  Do you understand?

A    Yes.

Q    Unlike a normal deposition, I don't know isn't a sufficient answer, because Banana Blossom has an obligation to produce someone who does know.  Do you understand?

A    Can you repeat the question?

Q    Unlike a normal deposition, during a corporate deposition, I don't know is not a sufficient answer, because Banana Blossom has an obligation to produce someone who does know the information on the topics we identified. Do you understand?

A    Yes.

Q    I'm going to show you a document on the screen.  Can you see this document?

A    No, I do not.

MR. PEREZ:

I also can't see it on my end.

BY MS. PHELPS:

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Q    How about now, can you see the document on the screen?

A    Yes.

Q    Have you seen this document before?

A    I have seen this, but I'm not sure exactly this one.  I seen there's a lawsuit. Is it a new one or the old one?

Q    Do you see the title says, Notice of 30(b)(6) deposition.  This is an --

A    I do not recall I see this.

Q    Okay.  Do you understand that this is just the notice of your deposition for today?

A    No, I don't.

Q    What don't you understand?

A    I never seen this document, like 30(b)(6), --

Q    Okay.

A    -- and I don't know exactly what is document for.

Q    Okay.  If I scroll down, looking at it now, do you see the list of deposition topics?

A    Yes.

Q    Okay, and can you read the above paragraph?

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

A    (Witness peruses document).  Yes.

Q    So do you understand that this is a notice for your deposition, this deposition of Banana Blossom today with a list of topics to testify on under deposition topics?

A    Yes.

MS. PHELPS:

We will attach the 30(b)(6) notice of deposition as Exhibit A.

BY MS. PHELPS:

Q    Have you brought any documents with you today for this deposition?

A    No, I do not have any document with me.

Q    Is there anyone else in the room with you today?

A    No.  Just me.

Q    Do you agree not to communicate with anyone else during this deposition by phone, text, email, et cetera other than those on this Zoom presently in the Zoom conference?

A    Yeah, I agree.

Q    Did you do anything to prepare for this deposition?

A    No, I did not.

Page 12

Q    Where is Banana Blossom located?

A    500 9th Street, Gretna, Louisiana 70053.

Q    How many tables does Banana Blossom have in the restaurant?

A    Fifteen.

Q    And what's the seating capacity?

A    Sixty.

Q    And who is the owner of Banana Blossom?

A    It's me.

Q    Okay.

A    I'm the owner.

Q    Okay, when did Banana Blossom first open?

A    2009.

Q    Who owns the building that the Banana Blossom is in?

A    I own the building.

Q    When you say that, you mean you personally as Jimmy, not Banana Blossom Thai Cafe?

A    Yes.

Q    How much rent does Banana Blossom Thai Cafe pay to you as Jimmy?

Page 13

A    It's 10,000.

Q    Per month?

A    Yes.

Q    Do you store any records or property of Banana Blossom outside of that location in Gretna?

A    No.

Q    Are there any documents or property or anything in your home?

A    What kind of document are you --

Q    Like any records of Banana Blossom.

A    Yeah, I have document at home.

Q    What documents do you have at home?

A    Just usually like documentation for payrolls and you know, stuff for -- you know, like receipt and all that.

Q    Okay.

A    For the CPA.

Q    How many employees work for Banana Blossom?

A    About 15 or less.  I'm not -- yeah.

Q    Are there any employees who work outside of the restaurant location?

A    No, ma'am.

Q    Does Banana Blossom have any policies

Page 14

of insurance?

A    No.

Q    So no commercial liability insurance or anything like that?

A    We do have commercial insurance liability.

Q    Who is that insurance with?

A    I don't know the name by heart, but I could give you information later.

Q    Okay.  Okay.  Do you personally handle the insurance, or is there someone else with Banana Blossom that handles the insurance policies?

A    My insurance agent handle the policy.

Q    Do you know who your insurance agent is?

A    Blake Lawson.

Q    Where is he based?

A    His office is on Lafayette down the street, Lafayette and Fifth Street, I think, yeah.  Fourth Street, yeah.

Q    All right, and you said that there were 15 employees with Banana Blossom.  What kind of roles do they each have?  What's their job title?

A    It's split by front of the house and back of the house.

Q    Is front of house servers, expediters, host, general manager?

A    Yes.

Q    Are there any other front of house roles?

A    That's it.

Q    What about the back of house roles?

A    Just kitchen staff, prep.

Q    What are their job titles?

A    Chef, cook, prep, dishwasher.

Q    Okay.  What job responsibilities do the servers have?

A    Serve food, make drink, yeah, just communicate to customer.

Q    What about expediter, what job responsibilities do they have?

A    They work with server.  So they do take phone order.  They pack food.  They run the food.

Q    And the servers, they just rotate back and forth with who is expediter on certain shifts; is that right?

A    Yes.  It's all rotation for the

Page 16

server.

Q    Okay.  About how many kitchen staff work on a lunch shift?

A    About four.

Q    How many kitchen staff work on a dinner shift?

A    Five or six.

Q    And how many general managers are there?

A    There was only one.

Q    What's the job responsibility of the general manager?

A    She take care of schedules, answering staff question, customer's questions.

Q    Since 2009, how many general managers has Banana Blossom had?

A    We had just one.  Yeah, we had just one in like 2020, I think.

Q    And who is that?

A    Twenty-one.  Sara.

Q    How long was Sara the general manager?

A    Like four years, I think, yeah.

Q    You said beginning in 2021 or around 2020?

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

A    I want to say 2021.

Q    Who had the ultimate authority to hire and fire employees?

A    It depends on the situation.

Q    Okay.  What did it depend on?

A    It depend on what circumstance, but we normally never fire people.

Q    Would Sara have had ultimate authority to hire or fire an employee without consulting with you, Jimmy, first?

A    She normally would ask, but we never fire people.

Q    Sara is no longer with Banana Blossom, correct?

A    Yes.

Q    Is there a new general manager since she left?

A    No.  I was -- I'm the owner and the manager, like doing the manager job.

Q    Has Banana Blossom retained any outside agencies, vendors for administrative-type duties?

A    No.  No.

Q    I'm asking you now as the corporate representative, but what would you consider

Page 18

the job responsibility of Jimmy as the owner?
Did the owner have any responsibilities?

A    Yeah, I take care of -- I go to work every day.  I take care of every situation that come in and just help out everybody.

Q    Okay, and as Jimmy, you receive a salary; is that right?

A    Yes, I do.

Q    What is that salary currently?

A    Like I want to say, 10,000 a month.

Q    Per month, okay.  You said per month, right?

A    Yes, per month.

Q    Is any travel required to run Banana Blossom, like trips outside of Louisiana?

A    No.

Q    As Jimmy, you receive a share of profit from Banana Blossom; is that right?

A    Yes.

Q    Does anyone else receive profits from Banana Blossom?

A    No.

Q    I'm going to show another document on the screen.  Can you see the document on the screen?

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

A    Yes.

Q    Have you seen this document before?

A    Yes.

Q    Now, this is the payroll for July 2024 at Banana Blossom; is that right?

A    Yes.

Q    This was a normal payroll for Banana Blossom, correct?

A    Say it again.

Q    This is a normal payroll for Banana Blossom.  The other payrolls, you know, for other months look similarly.

A    Yes.

Q    This shows that there are salaried employees, and there are hourly employees; is that correct?

A    Yes.

Q    For salaried employees in the tip line, there's no tips reported, correct?

A    Yes.

Q    Who are the salaried employees listed here?

A    That's chef, cook, manager, dishwasher.

Q    So some of the kitchen staff were

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 20

salaried; is that right?

A    Yes.

Q    Which kitchen staff was salaried?

A    Emon, Voravijit, Marchie, Ed, Peter.

Q    What were their roles?

A    They -- it depend on their position, but they work in the kitchen.

Q    What about the hourly employees, what were their roles?

A    Like we discussed before, server, expo, host.

Q    And on this sheet where it says, expo 10 an hour, that means host, correct?  Expo is used to mean the host the position?

A    Yeah.  At the time, we have different like, you know, agreement between the employee, and I might have put like a -- what is it?  Yeah, expo.

Q    So before mid May 2025, expo and servers were paid below the minimum wage at $5.00 an hour; is that correct?

A    The servers, I don't remember exactly, but we did make adjustment, because there was the -- they not happy, just because the -- what I want to say?  Wait.  Let me look

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 21

at the last name.  We did -- we make some changes.  I don't know exactly when, just because -- everybody agreed to do like a tip pool system, because some of them, they were not happy, because they work in the back, and then, they don't make as much as the server.  So we come into like a situation, okay, this is -- we can change the hour rate, and we'll do the tip pool.

Q    But an adjustment was made in mid May 2025 to raise the server pay at the minimum wage; is that right?

A    To 7.25?

Q    Yes.

A    Yes.

Q    But before that, they were paid below the minimum wage; is that right?

A    We pay at five.

Q    Yes.  You see on the screen under the rate column, it says, you know, where it intersects with server, it says five an hour; is that right?

A    Yes.

Q    And during this time while they were paid under the minimum wage, Banana Blossom

Page 22

claimed tip credit; is that right?

A    I don't -- I couldn't really answer this question.

Q    Okay.

A    You have to ask John.  Sorry.

Q    Meaning, you were able to pay them below the minimum wage, because they received tips; is that right?

A    Can you repeat the question?

Q    So you were able to pay these employees below the minimum wage at this time, because they received tips?

A    No, because there was agreement that we agree on.

Q    Do you understand that the minimum wage is the state law, correct?

A    Yes.

Q    And that cannot be circumvented by a private agreement, correct?

A    Yes.

Q    Do you understand what a tip credit is?

A    No, I do not.

Q    Have you ever spoken with your accountant about the tip credit?

Electronically signed by Lori Marino (601-401-997-8989)

a5ccf193-3881-48f4-bca0-537c38fd0fe4

A     No.

Q     Who handles Banana Blossom's payroll?

A     My CPA, Account Services Unlimited.

Q     How many different accountants has Banana Blossom had over the years?

A     We have two.  Yeah, we have two.

Q     So currently, your accountant is Account Services Unlimited?

A     Yes.

Q     And who was it before that?

A      It was Christian Nguyen.

Q     So we've gotten some documents from Mr. Nguyen.  So I'm going to ask you some questions about Banana Blossom's finances. How many bank accounts and credit cards include Banana Blossom Thai Cafe, LLC as a holder?

A     I have two.

Q     And what are those?

A     Personal and business.

Q     Who are those accounts with?  Do you know who those accounts are with?  Is he frozen?  Jimmy, can you hear us?

MS. PHELPS:

We'll attach the payroll as

Electronically signed by Lori Marino (601-401-997-8989)                                            a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 24

Exhibit B, and let's go off the record to see if we can get Jimmy offline.

MR. PEREZ:

Okay I'm reaching out to him right now.

(Technical interruption.)

BY MS. PHELPS:

Q    I think I was asking who handles the payroll at Banana Blossom.

A    Account Unlimited.

Q    How does that work?  What type of interaction do you have with Account Unlimited?

A    I use their service just to do payroll and just, you know the CPA stuff.

Q    Do you upload documents to some kind of system for them, or do you bring them hard copy documents?

A    They bring the receipt, and they document it.

Q    What type of information, like documents, are you giving the accountants?

A    Invoices for the vendors and food supplies.  And payroll.

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Q    When did you switch from Christian to Account Services Unlimited?

A    I don't know off the top of my head, but we did change the service.

Q    I think I was asking you how many bank accounts and credit cards have Banana Blossom Thai Cafe, LLC as an account holder.

A    We have two bank account one is my business, one is personal.

Q    Okay.

A    And credit card, I have about two or three.

Q    Which account is business, and which one is personal?

A    Banana Blossom.

Q    I mean the banking institution. Which account is personal, and which one is business?

A    The name is Banana Blossom is business, and Rattanasak Chotikarnkul is personal.

Q    I'm going to pull up some documents on the screen with the accounts for us to go over.  Okay, can you see this document on the screen?

Page 26

A     Yes.

Q     Have you seen this document before?

A     Yes.

Q     This is a document prepared by your accountant, Christian Nguyen, former accountant; is that right?

A     Yes.

Q     This is a balance sheet for Banana Blossom Thai Cafe, LLC for 2020; is that right?

A     Yes.

Q     So this shows that in 2020, the total checking and savings was $471,966.21; is that right?

A     Yes.

Q     And there's a checking and savings account.  It's a Chase ending in 4062; is that right?

A     Yes.

Q     And the saving ending in 4137; is that right?

A     Yes.

Q     And there's also under liabilities, it lists credit cards, Chase ending in 5830; is that right?

Page 27

A    Yes.

Q    Chase ending in 9311; is that right?

A    Yes.

Q    Chase ending in 9840?

A    Yes.

Q    Citi, 1252, correct?

A    Yes.

Q    And Citi, 9936, correct?

A    Yes.

Q    And these are listed under the Banana Blossom Thai Cafe business balance sheet; is that right?

A    Yes.

Q    Are these all business accounts?

A    Yes.

Q    Did you use any of the -- were any of these used for personal expenditures?

A    No.

Q    I also see listed liabilities: Mortgages on a Honda for $3,976.97; is that right?

A    Yes.

Q    Is that a car used for the Banana Blossom business?

A    Yeah, that's a truck, and the --

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 28

yeah, okay, we had a truck, and we have the SUV.

Q    And the Lexus is the SUV you're referring to?

A    Yes.

MS. PHELPS:

We will attach this as Exhibit C.

MR. PEREZ:

I'm sorry, Hope.  Can I make a clarification?

MS. PHELPS:

Yes, sure.

MR. PEREZ:

The 3976.97 is listed under the Lexus not the Honda.

MS. PHELPS:

Yes.  Okay, I see that now.

THE WITNESS:

So previously, we had two vehicle, and then, when the tornado hit so the vehicle got -- the Honda truck was destroyed from the tornado. So we only have one, which is Lexus.

MS. PHELPS:

Page 29

We will attach this as Exhibit C. We'll move onto another one. I'm having some difficulty with the shared screen feature.

BY MS. PHELPS:

Q   Can you see the document on the screen?

A   Yes.

Q   This is the same type of document, right, but for 2021?

A   Yes.

Q   I believe this lists the same checking and savings accounts, correct?

A   Yes.

Q   And the total checking and savings is $572,087.34?

A   Yes.

Q   And this lists credit cards, a Chase 3873, correct?

A   Yes.

Q   A Chase 5830, correct?

A   Yes.

Q   And Citi 9565, correct?

A   Yes.

Q   And were those all business accounts?

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 30

A    Yes.

MS. PHELPS:

We'll attach this as Exhibit D.

BY MS. PHELPS:

Q    Can you see the document on the screen?

A    Yes.

Q    This is the same type of balance sheet as before, correct, but for 2022?

A    Yes.

Q    These are the same checking and savings accounts, correct?

A    Yes.

Q    And for credit cards, it lists a Citi 8656, right?

A    Yes.

Q    A Sapphire credit card ending in 5566, correct?

A    Yes.

Q    And a United credit card ending in 6382, correct?

A    Yes.

Q    And these are all business accounts and cards, correct?

A    Yes.

Page 31

Q    Total checking and saving for 2022 is $535,080.34; is that right?

A    Yes.

MS. PHELPS:

We'll attach this as Exhibit E.

BY MS. PHELPS:

Q    Okay, can you see this document on the screen?

A    Yes.

Q    This is another balance sheet but for 2023, correct?

A    Yes.

Q    And there's some new checking and savings account listed here.  There's a Chase savings, 9204, correct?

A    Yes.

Q    And a Chase ending in 0172, correct?

A    Yes.

Q    A Chase ending in 4062, correct?

A    Yes.

Q    A Chase ending in 9363?

A    Yes.

Q    And a savings account ending in 4137?

A    Yes.

Q    And then, for credit cards, it says

Citi account ending in 9711?

A   Yes.

Q   Sapphire ending in 5566.

A   Yes.

Q   And United credit card ending in 9672, correct?

A   Yes.

Q   We have total checking and savings at $30,475.06; is that right?

A   Yes.

Q   Total assets of $882,075.06; is that right?

A   Yes.

Q   I misread that.  Total assets of $906,617.66 down under the total assets, correct?

A   Yes.

MS. PHELPS:

We'll attach this as Exhibit F.

BY MS. PHELPS:

Q   Which bank account was the employee payroll paid out of?

A   I don't remember by heart, but we did have another account just for the payroll at one point.

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 33

Q    Do you know what institution it was with?

A    Chase Bank.

Q    Was it one of the ones I just went through?

A    Yes.

Q    Do you know if it was one of them -- there were three Chase accounts ending in 4062, 0172, 9363.  Do you know which one of those it was?

A    I don't remember by heart.

Q    You understand that you're the corporate representative?  You were designated to testify on the topic of pay and payroll structures, correct?

A    Yes.

Q    So today, before us, you don't have evidence of which account or accounts exactly the payroll was paid out of, correct?

A    I don't remember the number by heart, as I told you.

Q    Are you as Jimmy also listed as a holder on a number of these accounts?

A    Well, the personal is under my name. Banana Blossom is under Banana Blossom, and

I'm the owner.

Q    Okay.

A    Yeah.

Q    Do some of these cards include both your name and Banana Blossom as a company name?

A    It's only -- yes.

Q    Which ones are those?

A    For Chase Sapphire, it's Banana Blossom.  Citi also is Banana Blossom and United.

Q    So Chase, Sapphire, Citi and United are all Banana Blossom?

A    Yes.

Q    What about the other regular Chase credit cards, not the Sapphire?

A    It could have been a debit card.

Q    Were any of these accounts also used for personal expenditures?

A    No.

Q    I'm going to show you another document.  Can you see the document on the screen?

A    Yes.

Q    Have you seen this document before?

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

A    Yes.

Q    This is a document prepared by your accountant, correct?

A    Yes.

Q    And this is the 2023 transaction detail by accounts for Banana Blossom Thai Cafe, LLC, correct?

A    Yes.

Q    This particular one was prepared by your former accountant Christian Nguyen, correct?

A    Yes.

Q    He used the banking and other documents that you gave him to do this, correct?

A    Yes.

Q    I'm going to go to page 49.  Do you see here on page 49 where it says Cartier Paris with United credit card, $8,863.48, correct?

A    Yes.

Q    Above that, there's thousands of dollars of ATM withdrawals from the Chase accounts, correct?

A    Yes.

Electronically signed by Lori Marino (601-401-997-8989)

a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 36

Q    What was the Cartier Paris charge and the ATM withdrawals for?

A    So the ATM withdrawal is for tips, for the daily tips.

Q    The ATM withdrawals is for the employees's daily tips, you're saying?

A    No.  They was like for -- because the server, they take the tip home everyday.

Q    Are you saying that you -- so they take the cash tips home, correct?

A    Yes.

Q    Are you saying that you gave them money from the ATM withdrawal for credit card tips?

A    Say it again.

Q    So they take their tips home every night.  So what are the ATM withdrawals for from the Banana Blossom account?  Is that the credit card tips being paid in cash?

A    Yes.

Q    Is that documented anywhere?

A    You're going to have to ask my CPA.

Q    Who made these withdrawals from the ATM?

A    I do.

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 37

Q    And the Cartier Paris charge?

A    Yeah, I made that purchase.

Q    So there are some purchases like that on the business accounts, correct?

A    That -- so I might have used -- hold on.  So which one are you referring to?

Q    I'm looking at the line under personal draw expense.  It says one line July 25, 2023, Cartier Paris.

A    Yes.

Q    And there's other things under it, as well, Jimmy Choo, Macy's, Nike, Sara Prada, Sunglass Hut.  So some of these are personal expenditures, correct?

A    Say it again.

Q    Some of these are personal?  These aren't related to the business of Banana Blossom.

A    Yeah, some of them are personal, because I may have like used wrong card when I travel.

MS. PHELPS:

We'll attach this as Exhibit G.

BY MS. PHELPS:

Q    Has Banana Blossom used any other

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 38

accountants beside Accounting Services Unlimited and Christian?

A    No, just two.

Q    Do know who the accountant that you work with at Accounting Services Unlimited is?

A    Thomas Fontaine.

Q    I'm going to show you another document on the screen.  Have you seen this document before?

A    Yes.

Q    These are paycheck stubs for the July 2024 pay period, correct?

A    Yes.

Q    All right, and these are -- I can scroll.  These are standard paystubs for Banana Blossom, correct?

A    Yes, from Christian.

Q    So for the employees that we went over before that were salaried employees, there's no line on here for reporting tips to salaried employees.  So you have one for you, Jimmy.  It just says salary.  It doesn't say tip, correct?

A    Yes.

Q    If we go to Sara's, it just says

salary, 4,400.  There's no line for tip, correct?

A    Yes.

Q    And on these paystubs also -- let me see.  For example, Connor Pulliam's paystub, there's a line for server hours and expo hours.  Do you see that?

A    Yes.

Q    Where it's labeled expo hours here, that means they worked as a host?

A    Yeah.  At that time, it was host.

Q    Then, where it says server hours, that's actually combined, the expediter and server hours?

A    Yes.

Q    If someone was making overtime as an hourly employee, it would show up on a document like this, correct?

A    Yes.

Q    You've produced or your attorney has produced these paystubs to us, correct?

A    Say that again.

Q    We received these paystubs from you and your attorney.

A    It should come from my CPA.

Page 40

Q    I'm not asking you about any conversations you have had with your attorney, but we sent discovery requests to them for you asking you to produce certain documents.  So you gave certain documents like this, like paystubs to your attorney to provide to us, correct?

A    I don't fully understand the question.

Q    Did you give documents to your attorneys for this case?

A    Oh, yeah.  Yeah.  Yes.  It was my request from my CPA to John Perez.

Q    I'm just saying that that is how we got these paystubs.  Before September 2024, these paystubs were like this for monthly pay periods; is that correct?

A    2024?

Q    So I've gone through the records that were produced, I'll represent to you; and if you're looking at these paystubs, the pay period is monthly.  If you're looking at the one on the screen for July 2024, 1st of July to 31st of July, that's a monthly pay period, correct.

Page 41

A    Yes.

Q    And then, in September of 2024, there was a change, and the pay periods switched to biweekly; is that correct?

A    Yes.

Q    So these monthly pay periods, they recorded hours per month; is that correct?

A    Yes.

Q    And then, the biweekly pay periods, those recorded biweekly hours, hours for a two-week period, correct?

A    Yes.

Q    Were the hours worked by each employee on a weekly basis recorded anywhere?

A    Repeat the question again.

Q    There's records showing hours worked per month and hours worked biweekly, correct?

A    Yes.

Q    Were hours that were worked weekly per week recorded anywhere?

A    Um-huh (affirmative expression).

Q    Where was that?

A    Normally, the manager will collect the hours, and she total the work hours and send it to me.

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 42

Q    Okay.

A    Because we don't keep all the --
every record.  We just keep a number and send
to CPA.

Q    And you mean the number weekly, or
you mean the total number annually or monthly?

A    At some point, it was monthly, and
then, it become -- and then, it changed to
biweekly.

Q    So you don't save the record of the
weekly hours?

A    No, we do save.  We put on like Excel
and send that to our CPA.

Q    Okay.  We have not received any
records like that.  Is that something that you
haven't produced to your attorneys yet?

A    I don't have -- well, my CPA had all
the hours.

Q    Are you referring to the new CPA or
Christian?

A    Both.

Q    We subpoenaed Christian's.  Are you
saying if it exists, Christian would have
produced it?

A    No, Christian -- well, like I said,

Page 43

Sara would give me the number of the work hour, and I emailed that to Christian or Thomas.

Q    That was per week or --

A    For Christian, it's per month.

Q    Okay, and then, Thomas is biweekly?

A    Yes.

Q    But nobody has the weekly hours?

A    No.

Q    Let's look at Connor's paystub that's up here.  So 136 plus 40 hours, that's 176 hours for the month, correct?

A    Can you say it again, please?

Q    So looking at Connor's hours for July of 2024, 136 server hours, 40 expo hours, that's 176 hours total, correct?

A    136 and 40, yes.

Q    So that would be roughly possibly 44 hours per week, correct?

A    For this period, yes.

Q    So that would be 16 hours more than if someone worked just 40 hours per week every week of the month, correct?

A    We normally scheduled staff like about 30, 35 hours.  Connor might have picked

up shifts from everybody else in the whole month.

Q    And that's something that employees do, right?  They pick up shifts from other people who have something going on, can't work that day, correct?

A    Yes.

Q    So even on a monthly basis, you can see from this paystub that Connor is not receiving overtime pay, correct?

A    Not on this one.  We normally like -- like I said, we normally don't schedule like people over 40; but if they pick up a shift, so he got some hours; and so you know, I just send a -- like I said, when the manager send me the hours, I just put it in and send it out to CPA.  I didn't have time to look through every like numbers, because there was a whole bunch.

Q    Is this representative of how all of the front of the house employees were paid?

A    Yes, at that time.

Q    So if employees picked up shifts over 40 hours, they did not receive overtime that's reflected on these paystubs, correct?

A    Like I said, I overlook the hours, and the server, they didn't bring to my attention.  If they would, I would have corrected it.

MS. PHELPS:

We'll attach this as Exhibit H.

MR. PEREZ:

Hope, nothing crazy here, but I'm going to object to the math for four hours per month.  If we could get more specific on that calculation.

MS. PHELPS:

Okay.  Can we stipulate that this is a total of 176 hours, correct?

MR. PEREZ:

Yeah.

MS. PHELPS:

And that it's certainly over what would be 40 hours per week?

MR. PEREZ:

Yes.  We can go over the exact number.

MS. PHELPS:

Okay.

MR. PEREZ:

This may not be the space, but we're not going to object to any overtime if that's just a mere calculation moving forward on that one.  We can skip that.

MS. PHELPS:

You're not objecting to -- you're stipulating that employees were not paid overtime?

MR. PEREZ:

Correct.  It's just a matter of calculating the correct overtime to be paid to the employees.

MS. PHELPS:

Okay.  Is there any argument that there are records by records kept weekly that would show those hours?

MR. PEREZ:

Not to my knowledge, but again, it's just calculating at that point.

MS. PHELPS:

Okay.

Page 47

BY MS. PHELPS:

Q    I would like us to just look at one more.  Can you see this document on the screen?

A    Yes.

Q    This is one of the some of the more recent biweekly paychecks, right?

A    Yes, from Accounts Unlimited.

Q    This is a paycheck for Katherine Templeton issued on November 20, 2024 for the October 27, 2024 to November 9, 2024 pay period, correct?

A    I'm still looking.  Yes.

Q    Is this representative of how these employees were paid, received their paychecks stubs on a biweekly basis?

A    Yes, sure.

Q    This shows that Kat worked 135 hours over that biweekly pay period, correct?

A    Let me look at it.  10/27 to 11, yes.

Q    Okay.  So if you divided that in half per week, that would be 67.5 hours per week, correct?

A    Yes.

Q    So she did not receive any overtime,

Page 48

even on a biweekly basis, correct?

A    Yes.

MS. PHELPS:

We'll attach this as Exhibit I.

BY MS. PHELPS:

Q    I'm going to show you another set of documents.  Can you see this document on the screen?

A    Yes.

Q    This is a 2023 Schedule K-1, Form 1120-S, "Shareholder's Share of Income, Deductions, Credit," et cetera from Banana Blossom Thai Cafe, LLC; is that right?

A    Yes.

Q    In 2020, the ordinary business income -- actually, I grabbed the wrong one.  This is 2023.  In 2023, the ordinary business income was 562,740; is that right?

A    Yes.

MS. PHELPS:

We'll attach this as Exhibit J.

THE WITNESS:

How long is the meeting going to be, because it's almost like 3:00 o'clock here?

Page 49

MS. PHELPS:

Until we get through it.  We noticed it the individual one to start at 3:00, but you know, if we have to go through this one longer, --

THE WITNESS:

I mean like --

BY MS. PHELPS:

Q   Can you see this document on the screen?

A   Yes.

Q   This is the same kind of form as last time but for 2020, correct?

A   Yes.

Q   Have you seen these before?

A   I don't recall.

Q   In 2020, the ordinary business income for Banana Blossom was $334,708, correct?

A   Yes.

MS. PHELPS:

We'll attach this as Exhibit K.

BY MS. PHELPS:

Q   If you want to move it along, I'll represent to you, does it sound right that in

Electronically signed by Lori Marino (601-401-997-8989)    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 50

2021, the ordinary business income for Banana Blossom was 353,629?

A    Yes.

Q    In 2022, that ordinary business income was 374,835?

A    Yes.

Q    Do you know what the business income was in 2024?

(Technical interruption.)

MS. PHELPS:

Jimmy, are you there?  Jimmy, can you hear us?

THE WITNESS:

Yes.

BY MS. PHELPS:

Q    Do you know what the business income was in 2024?

A    I don't know about that.  I don't know the number on the top of my head.  I have to look at the report.

Q    What about in 2025?

A    I don't know the number, you know, on top my head.

Q    Was it trending upwards?

A    You're asking like is it more, like

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 51

more sales?

Q    Yeah.  So it went --

A    Than 2024?

Q    Yes.  So in 2020, it was 334,708. Then, it went up to 353, 374; and then, in 2023, it was 562,740.  So it was going up, correct?

A    Yes.

Q    To your knowledge, in 2024 and 2025, it was still trending upwards?

A    Yes.

Q    I'm going to move on to the topic of the tip pool and structure, tip pool structure.  I'm not talking about the period before May, mid May 2025, before, you know, the letter from your attorney.  The way that the tip pool was structured at this time, all of the tips received from tables and to-go orders were placed in a tip pool; is that right?

A    Yes.

Q    Then, a flat percentage, most recently two percent, was taken out to go towards a credit card fee; is that right?

A    Yes.

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 52

Q   And then, 10 percent of the remaining pool was taken out and divided evenly among the kitchen staff; is that right?

A   Yes.

Q   And then, five percent was taken out of the remaining pool and divided between a host and busser?

A   Yes.

Q   Then, the server --

A   And that was agreement from all front of the house.

Q   And then, the servers and expediters would each get even shares of the remaining pool; is that right?

A   Yes.

Q   On a typical weekend night, there were four servers and two expediters; is that right?

A   Weekend or weekday?

Q   Weekend nights.  Weekend dinner shift.

A   Yes.

Q   Then, a typical lunch shift would have two servers and one expediter?

A   Yes.

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Q    Sometimes, the general manager Kulisara Jinawong, worked as a server, correct?

A    Yes.

Q    When she worked as a server, she was included in the tip pool, correct?

A    Yes.

Q    So when she was in the tip pool, she took a server's share, correct?

A    Yes.

Q    So when she worked as a server, even though she was a salaried employee, she also received a share from the tip pool, correct?

A    Yes.

Q    We looked at the paycheck, the stubs and payroll earlier.  The tips she took aren't recorded on payroll or paystubs, correct?

A    Yes.

Q    It is recorded, or it's not recorded?

A    It's not recorded.

Q    So there's no evidence of how much money Sara received from the tip pool, correct?

A    Yes.

Q    I'm going to show you another

Electronically signed by Lori Marino (601-401-997-8989)                     a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 54

document.  Can you see the document on the screen?

A    Yes.

Q    Have you seen this image before?

A    The first time I see this image.

Q    I'll represent you this is the tip log book.  Did you ever look at these tip log books?

A    I usually don't look at it.  Like I look here there, but I don't --

Q    Are you familiar with the way that these records were kept and calculated in these books?

A    Yes.

Q    Do you know that these pages were filled out by a server at the end of each shift; is that right?

A    Yes.

Q    Did you ever fill out any pages in these notebooks?

A    No, I do not.

Q    Did you know that this is the calculation of how the tip out was calculated?

A    Yes.

Q    Were you familiar with that, you

know, the top part of the page is the lunch shift, and the bottom part of the page is the dinner shift?

A    Yes.

Q    Then, at the top each page is the date?

A    Yes.

Q    So these, if I scroll, are June 17, 2025 and then, June 18, 2025 and June 20, 2025, correct?

A    Yes.

Q    You see the calculations here, correct?

A    Yes.

Q    Did you understand that the first line, the largest number is the amount of money in the tip pool before any deductions were made?

A    Yes.

Q    And then, the 10 percent -- the times 10 percent is the amount given to the kitchen, the back of house employees, correct?

A    Yes.

Q    Then, the next line is the amount given to the host, correct?

Page 56

A    Yes.

Q    Then, that final line demonstrates the amount of money left in the tip pool being divided by the number of servers and expediters, correct?

A    Yes.

Q    And the list of names on these final lines, that is servers and expediters for the shift, correct?

A    Yes.

Q    So some of these lists, for example, they include Sara's name working server or expediter shifts, correct?

A    Yes.

Q    Were these composition, these notebooks the only places that tip outs were recorded?

A    Yes.

Q    Employees, they would use a notebook until they ran out of pages, and then, they would move to a new notebook; is that right?

A    Yes.

Q    Are all the notebooks kept at Banana Blossom or only the active notebook?

A    Only active notebook.

Page 57

Q    Who has the past notebooks?

A    I keep it just for like one month period and then, just, you know, like -- like I just throw it away.

Q    Okay.

A    Can we --

MS. PHELPS:

We'll attach this as Exhibit L.

THE WITNESS:

Can I explain about Sara's tip pool thing?

BY MS. PHELPS:

Q    Yes.  Yeah.

A    So Sara was a manager.  So I allow her to work like one shift as a server to work the floor and to see, observe the problem and, you know, like figure out what happened in that shift, you know; and so the conversation with me and Sara was like -- she's like, we don't put -- she asks me whether I can not add the tip on her payroll, because her paycheck was -- her payment was so large, and her tax taken out, and I was agreeing with that agreement.

Q    Okay.

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 58

A    Yes.

MS. PHELPS:

All right, that will be Exhibit L.

BY MS. PHELPS:

Q    The next topic is credit card processing fees.  From 2012 to 2015, Banana Blossom deducted three percent from the tip pool to cover credit card processing fees, correct?

A    Yes.  I did discuss that to all the front of the house, and everyone agree.

Q    After 2015, Banana Blossom increased the deduction to five percent, correct?

A    Increased to five percent?

Q    A five percent credit card processing fee deduction was taken after 2015.

A    No.  It was from three and then, two percent and then, like zero.

Q    So I have records showing that one year ago, in 2024, Banana Blossom adjusted the deduction to two percent.  So before 2024, it was five percent; is that correct?

A    I don't recall that.  I don't recall it.

Electronically signed by Lori Marino (601-401-997-8989)                a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 59

Q    Do you have any evidence that before 2024, the deduction was anything less than five percent?

A    I know it was two percent at one point and then, like zero.  I don't know the date and time.

Q    So in 2024, it was adjusted to two percent with a three percent surcharge for customers, correct?

A    Yes.

Q    So that's two percent from the tip pool and then three percent surcharge for customers, correct?

A    Yes.

Q    That adjustment was made in 2024, correct?

A    Yes.

Q    Before that, it was five precent deduction from the tip pool, correct?

A    You mean 2024?

Q    Before 2024.

A    Yeah, it could be.  I don't remember back.

Q    None of these percentages were tied to the actual credit card processing fee,

Page 60

correct?

A    No.

Q    I guess these were a flat deduction from tips that did not reflect a variation among the different cards, correct?

A    Yes.

Q    And around mid-May 2025, Banana Blossom eliminated the credit card processing fee deduction; is that right?

A    Yes.

Q    Who controls the employee work schedules for Banana Blossom?

A    Sara was taking care of the work schedule.

Q    And you were telling me earlier about Sara working server shifts.  Do you have any evidence of how many or how often Sara clocked in as a server?

A    She doesn't clock in as server, because she was, you know working as a manager, but, you know, for that shift, you know, she was actively working as a server and host -- I mean server and expo.

Q    Okay.

A    And she didn't do the manager job.

Page 61

Q    Do you have any records of how many server shifts she worked or expediter shifts?

A    Usually, just one shift per week.

Q    Okay.

A    We don't schedule her to do a server job.

Q    How were the work schedules created and shared with the employees?

A    Usually, either we print it, and we have on the, you know, like the schedule at the restaurant, or she would just send out a text.

Q    Were records of past work schedules saved?

A    No, we normally don't save.  We might save just would one or two weeks.

Q    Does Banana Blossom have any employee handbooks, company policy manuals or personnel manuals?

A    No, we do not.  No, we don't have the manual.

Q    Did you ever tell tipped employees that the amount of the direct or cash wage you were paying them -- you ever tell the tipped employees the amount of the direct cash wage

Page 62

they were being paid as a tipped employee?

A    Say that again.

Q    Did you tell all of your tipped employees the amount of the direct you call it or cash wage they were being paid?  That's the 2.13 minimum or the $5.00 an hour you were paying.

A    Yeah.  We made discussion, and we changed the pay.

Q    Did you tell the tipped employees the additional amount that you claimed as a tip credit?

A    This tip credit, you have to ask my attorney.  So I don't -- I couldn't answer this question.

Q    Did you notify the tipped employees that the tip credit you claimed could not exceed the amount of tips they actually received?

A    We never had this conversation.

Q    Did you notify your tipped employees that all tips they received were to be retained by them individually except for a valid tip pooling arrangement limited to employees who customarily and regularly

Page 63

received tips?

A    Can you repeat the question?

Q    Did you notify your tipped employees that all tips they received were to be retained by them individually except for a valid tip pooling arrangement limited to employees who customarily and regularly received tips?

A    I'm not sure I understand the question correctly, but --

Q    So these are the five policies that the government requires you to implement before taking a tip credit.  So it's safe to say that you did not implement these policies, correct?

A    I'm gonna have to talk to John for this question.

Q    I mean, you understand that you are the corporate representative designated to testify on these topics, and that we gave these topics to your attorneys a month ago?

A    Yes.

Q    Did you notify your tipped employees that the tip credit would not apply to any tipped employee unless they were informed of

Page 64

the FLSA tip credit provisions?

A    We never have this conversation with my employee for this.

Q    Okay.

A    I did -- yeah.  Only conversation I have was the letters from my attorney to come.

Q    Who has decision-making authority for Banana Blossom?

A    It was me and manager.  It just depend on the situation.

Q    Did Jimmy, you report to anyone?  Was there anyone higher up than you?

A    No.

Q    We identified on some of the financial records that the line item regarding business fraud costs, 89,757 in 2023. Christian suggested that an employee had written checks to themselves.  Is that something that happened?

A    Yes, it did happen.  We have employee stole a check, and then, it was a mistake from -- like, that lady she stole a check, and the CPA did not like report it to me.  So I found later in till, yes.

Q    Who was the employee that wrote the

checks, the fraudulent checks?

A    Joy Gerhart.

Q    You said it was a mistake, or was it fraud?

A    Well, it wasn't a mistake.  She stole the money from the restaurant for three years.  That's why we changed from Christian to Thomas, because he didn't like carefully like do his work.

Q    Okay.

A    And he just has a lot of account, and he just -- you know, he missed it, whatever.

Q    Does anyone other than Jimmy, you have hiring or firing authority?

A    No.  Just me or Sara.

Q    Did Sara ever hire or fire anyone?

A    Sara hired people, but like I say, we never fired people.

Q    When Sara hired people, Jimmy, you had final say on that?

A    She would come and consult me.

Q    How did Banana Blossom hire new employees?  Was it job postings or word of mouth?

A    On both.

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 66

Q    I'm on topic 11, work employment contracts.  Does Banana Blossom have work or employment contracts with anyone?

A    No.

Q    Jimmy, you are the only member manager of Banana Blossom Thai Cafe, LLC?

A    Yes.

Q    And no one other than you, Jimmy have a share in Banana Blossom, correct?

A    Yes.

Q    You alluded to this earlier. Beginning in April 2025, employees reported some complaints about the pay structure, correct?

A    Yes.

Q    On April 11, 2025, Connor Pulliam met with you to talk about the pay structure, correct?

A    Yes.

Q    I am going to show you a document. Can you see the document on the screen?

A    Yes.

Q    Have you seen this document before?

A    Yes.

Q    This is a document that Connor gave

you on April 11, 2025, correct?

A    Well, the document he gave me wasn't this one.  It was like Excel and Word, but he come up with a number.

Q    So this page?  I can scroll.

A    Yeah, I see this one.

Q    Are you saying you've seen it, or you haven't seen it?

A    I've seen it before.

Q    Sorry.  You're kind of breaking up. You said you have seen this document?

A    I have seen this one.

Q    Okay.  Okay.  And Connor gave you this document on April 11, 2025, correct?

A    Yes.

Q    Okay.  This document outlined some of what Connor said were violations and illegal workplace practices, correct?

A    Can you go to page again, please?

Q    The page above this one?

A    The one that you were asking me questions.

Q    Okay.  Let's read the line on this page.  This says, "If I were to use the above numbers from the last six months to find an

Page 68

average, that average would be about $100,000 illegally required to be tipped out per year," correct?

A    Yeah, according to his -- the Excel.

Q    Yes, according to what Connor wrote here.  Then, the last line here, it says, "By eliminating the illegal 10% kitchen tip-out and adjusting hourly wages to make splitting tips with expo legal, you would ensure that your restaurant operates legally and ethically moving forward," correct?

A    Yes.

            MS. PHELPS:

                We'll attach this as Exhibit M.

BY MS. PHELPS:

Q    I'm going to show you a screenshot. Can you see the photo on the screen?

A    Yes.

Q    Have you seen this screenshot before or this image before?

A    No.  First time I see this.  It was under -- oh, wait, hold on.  Yeah, I see this before.

Q    Okay, and you're familiar with this group chat BB FOH, Banana Blossom front of

Page 69

house, correct?

A    Yes.

Q    This is a screenshot of the text from you to the front of house employees on April 24, 2025, correct?

A    Yes.

Q    You revoked shift meal benefits, family meal or shift meal benefits for front of house employees three nights a week, correct?

A    Yes.

Q    And that was not the previous practice, correct?

A    No, that was not.  It was the chef. Like we have a discussion every other weeks about the situation, and she said like weekday, we don't have a lot of people working, and then, like a lot of time, we cook; nobody eat the food.  So we just decide to take it out.

Q    Okay.  You agreed to have another meeting with the employees, more than just Connor, about their complaints about the pay on May 2, 2025, correct?

A    I don't recall the date, but I did

Page 70

have -- I did make a meeting plan with Connor

and Sara and me in person one like Friday

night or Saturday night.

Q    Okay.  Was there a meeting where

Connor and some other employees informed you

that the pay structure at Banana Blossom was

unusual in comparison to other local

restaurants?

A    In the meeting, yes, but I was --

because I want to talk to Connor in person,

but then, Connor tell everybody that I have a

meeting with them.

Q    Okay.

A    Even two or three employees that's

not there, they bring them into the meeting --

Q    Okay.

A    -- and they were just -- and it

become really chaos, and they were so angry,

and that's the meeting -- that's how the

meeting went.

Q    They were angry and upset about the

pay structure; is that right?

A    Yes, but every meeting they come and

make some adjustment, but for that meeting, it

was just -- it was almost like they were

Page 71

attacking me.

Q    Okay.

A    You can ask Sara.  Sara was the manager.  She was witnesses.  She was during the whole thing.

Q    Were the employees at the meeting telling you that the pay structure was illegal?

A    They did mention it.

Q    They did or didn't?

A    They did.

Q    Did you have a conversation with Sara or did Sara express an opinion that the back of house employees should not be included in the tip pool?

A    No.  We never have a conversation with Sara.

Q    Okay.

A    Because the tips to the kitchen, we have this agreement since 2009 as soon as I opened the restaurant.

MS. PHELPS:

I'm going to attach this screenshot as Exhibit N.

BY MS. PHELPS:

Q    Can you see this document on the screen?

A    Yes.

Q    Have you seen this document before?

A    I have.

Q    This is a chart that Connor prepared and gave to you at the May 2nd meeting, correct?

A    Yes.

Q    According to Connor this showed pay schedules at comparable similar restaurants, correct?

A    Yes.

MS. PHELPS:

We'll attach this as Exhibit O.

BY MS. PHELPS:

Q    Did you have authority to remove the back of house from the tip pool, and maybe, if you wanted to compensate them, to raise their salaries?

A    Yeah, I have authority to do that.

Q    After that meeting, you imposed some new restrictions on the front of house employees; is that right?

A    Yes.  Well, for the report that

Page 73

Connor gave it to me, I did go ask a few of the restaurant owner, because I personally know them, and I did check on them.

Q    And what did they say?

A    I just ask them like their opinion and what they say, and they said like I'm -- they say like -- can you show me the screenshot again?  It's been awhile.

Q    Yeah, I can show you.  Of these listed, do you remember speaking with any of the owners or managers from any of these restaurants?

A    I speak to the owner of High Hat.

Q    Okay.

A    Yeah.

Q    And what did they say?

A    They say like, you know, like -- they say like yeah, they don't tip out the kitchen, you know, according to this.

Q    Okay.

A    And then, like --

Q    Who was the person from High Hat?

A    And then, --

Q    Go on.

A    I don't remember.

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Q    Who was the owner of High Hat who you spoke with?

A    Ryan.

Q    Do you know their last name?

A    I don't remember his last name. Sorry.

Q    Okay, --

A    Like I said, like I said, every time when the staff come to me. So I do some research. I make like change. I don't just ignore like any issue that come to the meeting.

Q    But Ryan with High Hat told you they don't have back of house in the tip pool there, correct?

A    Yeah, and he did mention like we, you know, like we pay like $5.00 per hour is very high.

Q    Okay.

A    That was the discussion.

Q    Okay, all right.

A    Because he pay like $2.15 or something.

Q    Okay. All right, can you see the screenshot, the photo on the screen?

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

A    Yes.

Q    Have you seen these texts before?

A    Yes.

Q    This was a group text from Sara to all front of house employees on May 4, 2025, correct?

A    Yes.

Q    You directed Sara to prohibit Connor from picking up anyone's shifts, correct?

A    Yes.

Q    Why did you prohibit Connor from picking up shifts?

A    Because he was attacking me at the meeting.

Q    Okay.

A    And he bring the whole team without an invited meeting, and that was very upsetting.

MS. PHELPS:

We'll attach this as Exhibit P.

BY MS. PHELPS:

Q    Can you see the photo on the screen?

A    Yes.

Q    Have you seen these texts before?

A    Yes.  It was from me.

Page 76

Q    This is a group text between you, Sara and Assata, or Ace, Simpson?

A    Yes.  Ace has been working with us for 11 years.  So he's like my little brothers.  So I was joking with him like Ace at the meeting, because Ace was the person that speak the least, and he show up at the meeting, and you know, he come apologize to me.  Like, I'm so sorry for the meeting; and then, that's why we come up with this, because you know, it was like if you own a business and your employee attacking you, you would be watch out for whoever attacking you.  That's my point.

Q    So the screenshot shows you sending a photograph of a chopping block list to Ace on May 4, 2025, correct?

A    Yes, because I told Ace, like, Ace, you've been good to me, and you know, like you like my brothers, because we know each other for a long-time.  Otherwise, I wouldn't do that.  It was a --

Q    And you made this list, correct?

A    Yes, I did.

Q    Did you share this list with any

Page 77

other employees or people?

A    No.

MS. PHELPS:

We'll attach this as Exhibit Q.

BY MS. PHELPS:

Q    Can you see the photo on the screen?

A    The photo of the plate?  Yes.

Q    So you have seen these texts before?

A    Yes.

Q    This is a screenshot of a text from you to all front of house employees on May 6, 2025, correct?

A    Yes.

Q    And this is you're requiring employees to come in earlier for shifts, correct?

A    I require employees to come to work on time.

Q    The lunch starts at 10:00 AM, and the dinners start at 4:30 PM.  Was that earlier than it was previously?

A    Dinner is 4:30.  Lunch, it was 10:00, just because they didn't have enough time to do the prep work, because they have to prep for the whole day.  We did make some

adjustment.

Q    Do you see how this text says from tomorrow on, all front of house, correct?

A    Yes.

Q    So this is changing the start times, correct?

A    Yes.  It was -- lunch was 10:30 before.

Q    Okay.

A    Now, it was 10 just because they didn't have enough time to do their prep work, and everybody come to work late.

Q    And in this last part, you threatened to terminate employees on the third time that they arrived more than five minutes late, correct?

A    Yes, I did say that.

Q    And it was not previously the practice to terminate employees who were more than five minutes late, correct?

A    It's not.  Like I said, if you have employee attacking you like that, you have to set a new rule for them.

Q    By attacking you like that, you mean at the meeting on May 2nd or with Connor and

Page 79

the others?

A    Yes.  It wasn't a conversation.  It's almost like they were yelling at each other.

MS. PHELPS:

We'll attach this as Exhibit R to the deposition.

BY MS. PHELPS:

Q    Can you see the screenshot photo on the screen?

A    Yes.

Q    Have you seen these texts before?

A    Yes.

Q    Is this a screenshot of a text from you to the front of house employees on May 6, 2025, correct?

A    Yes.

Q    Actually, this is May 7, 2025, correct?

A    Yes.

Q    May 7th.

A    Yes.

Q    This text is you requiring employees to keep their phones in a cellphone box during shifts, correct?

A    Yes.

Electronically signed by Lori Marino (601-401-997-8989)                                a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 80

Q    And it was not previously the practice for employees to keep their phones in this box, correct?

A    No, it was not.

Q    Why did you implement this practice?

A    Because everybody come in to work late, and everybody is already on the phone. They don't fully pay attention on employee.  I come up with the thing, and we have a meeting after, and I don't -- that thing never been practiced, the cellphone box.

Q    Okay.

MS. PHELPS:

We'll attach this as Exhibit S.

BY MS. PHELPS:

Q    On May 9, 2025, you had another meeting with the employees, the front of house employees, correct?

A    I don't remember the date, but yeah. What was the --

Q    I'll show you the document.  Okay, can you see the document on the screen?

A    Yes.

Q    Have you seen this document before?

A    Yes, I have.

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 81

Q    I'm not asking you any questions about conversations that you had with your attorneys, but this is a letter that your attorney drafted to the Banana Blossom employees, correct?

A    Yes.

Q    And it's dated May 9, 2025, correct?

A    Yes.

Q    And at the meeting on May 9th, you gave this letter to the employees; is that right?

A    To Connor.

Q    To Connor?

A    Yes.

Q    Were you aware that this letter was inaccurate, because you hadn't been paying the front of house employees the full minimum wage?

A    Well, they was pressuring me to get a document.  This document was -- we talk about this issue on like two days before that, and this document was produced like two days out.  So it was just the communication wasn't like a hundred percent, because we didn't have enough time, and they were pressuring me to get this

answer, because every time when Connor come, he always push me like the day, the time.  You know, like that was the -- you know, that's why we got this document, because of the time that we have, because --

Q    Go on.

A    No.  Go ahead.

Q    No, I was just going to close out, but if you have something else to say about this letter, or you were talking about Connor.

MS. PHELPS:

We'll attach this as Exhibit T.

BY MS. PHELPS:

Q    Do you have any agreements, releases or waivers that would stop, prevent any of the plaintiffs or other employees of Banana Blossom from participating in a class action?

A    No.

Q    All right, I'm going to show you a copy of a document filed in this case.  Can you see the document on the screen?

A    Yes.

Q    Have you seen this document before?

A    I think so, yeah.

Q    That it's your first amended answers

Page 83

and affirmative defenses to the plaintiff's lawsuit?

A    Yes.

Q    I'm looking at the fourth affirmative defense on record document page 15 -- or page 16.  It reads, "At all times, Defendants acted in good faith and had reasonable grounds for believing their actions were in compliance with the FLSA."  What actions did you take to ensure that you were complying with the FLSA, Fair Labor Standards Act?

A    You said number five?

Q    Number four, fourth affirmative defense.  It's split.

A    What is the FLSA?

Q    It's the Fair Labor Standards Act.

A    Yes.  So you're asking me how I make change to --

Q    I'm asking do you have any evidence of actions you took to ensure that you were in compliance with the FLSA?

A    I made some changes.

Q    What changes and when?

A    Like I made changes.  When they were coming to me, I made changes to fit their

Page 84

need; and when, I don't recall.

Q    Did you make changes after this lawsuit was filed?

A    No.  I made change before, before the lawsuit.

Q    What changes?

A    Well, I think like -- I think the pay is changed, I think, and it was changed.

Q    So that's the one change.  Are there any others?

A    It's from five to 7.25, and that's only one change.

Q    Okay.

A    I was supposed to have like an employee handbook, but it never happened, you know.  So I did.

Q    Who was handling the employee handbook or should have been?

A    It should have been me, because I did ask a lot of manager from different restaurant.  So they gave me some idea.  They gave me some thought, but, you know, like, I didn't have time to take care of the handbook.

Q    What other restaurant owners did you talk to about handbooks?

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 85

A    GW Fins.

Q    What's their name?

A    KYO, K-Y-O.

Q    Is that the owner or the manager?

A    He's the manager.

Q    Okay.  Anyone else you spoke with?

A    My friend that own a restaurant?

Q    Yes.  Any other restaurants owners or managers?

A    I talk to the owner of Good Catch --

Q    Okay.

A    -- and ask about, you know, how they -- how they -- about the employee policy, just try to get some idea.

Q    What's that restaurant called?

A    Good Catch.

Q    Okay, and what's the owner's name?

A    She go by Aom, A-O-M.

Q    I'm looking at the sixth affirmative defense, i.e. "hours worked" under the FLSA. Do you have any evidence that the plaintiff's time or hours worked is not compensable in this case?

A    I don't fully understand the question.

Q    Do you have any evidence that the plaintiffs's time, hours worked isn't compensable in this lawsuit, that they shouldn't have been paid for those hours?

A    Like I said, if they come to me, I would have corrected it, but it was like we always schedule people like under 35.

Q    Okay.

A    I have no problem like, you know, fixing like things.

Q    Okay, but you don't have any evidence that the time people worked wasn't compensable, meaning wasn't required to be paid?

A    No.

Q    Okay.

A    There's no policy.

Q    Looking at the tenth affirmative defense, it says, "Plaintiffs action is barred because they seek to recovery for time that is de minimus work time and thus not compensable under the FLSA."  What -- do you have any evidence that the time they worked is de minimus work time?

A    No, I don't have any evidence.

Page 87

Q    I'm looking at the 12th affirmative defense.  It says, "Without assuming the burden of proof, Plaintiffs were compensated for all hours worked in excess of 40 hours in any particular workweek (as Plaintiffs themselves reported their time worked) at a rate not less than that set forth by the overtime provisions of the FLSA."  Do you have any evidence that you paid the plaintiffs any overtime?

A    I don't have any evidence.

Q    Looking at the 13th affirmative defense, it says, "Without assuming the burden of proof, the defendants complied with all recordkeeping requirements of the FLSA."  Earlier, you testified that you did not save the notebooks of the tip logs or the shift schedules past one to two weeks or, you know, one notebook; is that correct?

A    Yes.

Q    Okay.  Looking at the 16th affirmative defense, in this case, plaintiffs are all front of house workers who worked as servers and expediters and participated in the tip pool; is that correct?

Case 2:25-cv-01341-NJB-MBN   Document 32-1   Filed 06/15/26   Page 88 of 94

Page 88

A    Yes.

Q    Do you have any evidence that these plaintiffs are not similarly situated?

A    No.

Q    Looking at the 17th affirmative defense, "Plaintiffs have failed to mitigate their alleged damages," do you have any evidence that any of the plaintiffs failed to mitigate their damages?

A    No.

Q    Looking at the 19th affirmative defense, do you have any evidence that the plaintiffs's claims are barred by a court in satisfaction, settlement or payment and release?

A    No.

Q    Looking at the 21st affirmative defense, it says, "Defendants' actions were in good faith conformity with and/or reliance on administrative regulation, order, ruling, approval, interpretation, or practice of the Department of Labor."  What Department of Labor regulations, orders, rulings, approval, interpretations or practices did you rely on?

A    I don't understand the question.

Electronically signed by Lori Marino (601-401-997-8989)                              a5ccf193-3881-48f4-bca0-537c38fd0fe4

Q    Okay.  This defense is saying that you relied on regulations, orders, rulings, things from the Department of Labor.  Do you have any evidence that you relied on regulations, orders, documents from the Department of Labor?

A    I have this labor, the sheet, like, you know, the poster, but it was in the office.

Q    Whose office was it in?

A    It's in my office.

Q    Do employees have access to your office?

A    Yes.

Q    So they could see the poster in your office?

A    Well, I never like hang the poster, but it was in the office.

Q    Oh, okay.  So it wasn't on the wall, correct?

A    Yes.

Q    Okay, but you kept it in your office, right?

A    Yes.

MS. PHELPS:

I'm going to attach this as Exhibit U.

BY MS. PHELPS:

Q   Can you see this document on the screen?

A   Yes.

Q   Have you seen this document before?

A   No, I have not.

Q   Do you understand that it's defendant's response to plaintiff's first set of discovery requests?

A   Say it again.

Q   Do you understand that it's defendant's, your, responses to plaintiff's first set of discovery request?

A   Yes.

Q   I'm looking at Request for Production Number 12.  Did you search all emails and text messages containing the terms "overtime", "over 40", "over forty", "more than 40", various spellings of that, "time and a half" or "salary"?

A   Oh, no.

Q   I'm looking at Request for Production Number 13.  Did you search all electronic

communications, meaning emails, text messages or anything concerning plaintiffs, their time worked, timekeeping, timecards, time sheets? Did you search emails and text messages for that information?

A    No, I didn't.

Q    Looking at Request for Production Number 21, did you search for all correspondence, including emails and text messages between you, Jimmy and Sara, the former manager?

A    No.

MS. PHELPS:

We're going to attach this as Exhibit V.

BY MS. PHELPS:

Q    I'm going to show you one last document for this deposition.  Can you see this document on the screen?

A    Yes.

Q    Have you seen this document before?

A    Yes.

Q    And this is your affidavit of verification for the discovery responses, correct?

A    Yes.

Q    It is accurate that you read all of the requests for admissions, interrogatories and requests for production, correct?  Is that accurate?  Did you read them all?

A    Yeah, I read them.

Q    And the responses and allegations in all of them, you believe they were true to the best of your knowledge, correct?

A    Yes.

Q    But you just testified that you didn't search for certain messages and communications that were requested, correct?

A    I never search for any of that that you ask me.

Q    So is it accurate that all of your responses were true?

A    Yes.

Q    Even if you are saying you didn't search for responsive information to some of them?

A    Well, I never search for anything, but I did read and answer whatever document I get and answer.

          MS. PHELPS:

Electronically signed by Lori Marino (601-401-997-8989)                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 93

We'll attach this as Exhibit W. That's all I have for the 30(b)(6) deposition.  I'll try to keep the individual shorter since you've answered as the corporate representative.

John, do you have any questions or cross or redirect?

MR. PEREZ:

No.

(Whereupon, the deposition was concluded at 3:50 PM.)

Electronically signed by Lori Marino (601-401-997-8989)                                    a5ccf193-3881-48f4-bca0-537c38fd0fe4

Page 94

C E R T I F I C A T E

I, LORI L. MARINO, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that RATTANASAK CHOTIKARNKUL,  after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 93; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 8th day of June, 2026.

LORI L. MARINO, CCR
CCR #87069
STATE OF LOUISIANA