Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CONNOR PULLIAM, ET AL            CIVIL ACTION NO. 25-1341

VERSUS                           SECTION "G" (5)

BANANA BLOSSOM THAI CAFE,
LLC, ET AL.


        DEPOSITION OF KULISARA JINAWONG, given

in the above-entitled cause via Zoom and through

Interpreter Ploysai Saengwisit, before Raynel E.

Schule, Certified Shorthand Reporter in and for

the State of Louisiana, commencing at 11:10

o'clock a.m., on Tuesday, the 19th day of May,

2026.

Page 2

INDEX

Page

Caption                              1

Appearances                          3

Agreement of Counsel                 4

Examination

      MS. PHELPS      4

Reporter's Certificate              39

Electronically signed by Raynel  Schule (101-061-243-7798)    114b321f-1539-47e4-8a60-6c1232727597

Page 3

APPEARANCES:

For the Plaintiff:

LAW OFFICES OF WILLIAM MOST
Attorneys at Law
BY:  HOPE PHELPS, ESQ.
201 St. Charles Avenue, Suite 114#101
New Orleans, Louisiana    70170


INTERPRETER:  PLOYSAI SAENGWISIT


Also Present:  Connor Pulliam

Reported By:  Raynel E. Schule
              Certified Shorthand Reporter
              State of Louisiana

S T I P U L A T I O N

It is stipulated that the deposition of KULISARA JINAWONG is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

* * * * *

Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 5

KULISARA JINAWONG, having been first
duly sworn, through the Interpreter, by
Raynel E. Schule, was examined and testified
on her oath as follows:

EXAMINATION

BY MS. PHELPS:

Q.   Okay.  I'll begin.  Thank you -- thank you
for being here this morning.  I know this
isn't easy.  Could you please state your
full name for the record.

A.   Kulisara Jinawong.

MS. PHELPS:

And I can send you the spelling
of that after.

BY MS. PHELPS:

Q.   Because we have an interpreter present, I'd
like to go over how that will go.  It seems
like it would be easiest if -- that we just
do everything translated if that's
everyone's preference.  Is that all right
with you?

A.   That's fine.

Q.   Have you ever given a deposition before
today?

A.   Never.

Page 6

Q. Do you understand that you are under oath today?

A. Understand, yes.

Q. You realize this means that your answers here today have the same force and effect as if you were in a courtroom with a Judge and a Jury?

A. Yes.

Q. Is there anything today that will prevent you from giving us your full attention?

A. No, ma'am.

Q. Are you taking any medications or suffering from any illnesses that would prevent you from understanding my questions or answering them fully?

A. No, ma'am.

Q. Is there anything else that would prevent you from giving complete and accurate answers today?

A. I'm not sure.

Q. Is there anything that you are aware of at this point that could impact that?

A. Yes, ma'am. If I -- you know, can I express myself at all? I feel like I'm being forced into this situation. This is

Page 7

not my intention.  I never wanted to be participated as a witness anymore, and I already informed, you know, the parties involved that I did not want to know, and I don't want this to interfere or affect my own business because right now I'm also an owner of the restaurant myself, so I -- I don't really want this to, you know, have an affect on my business that is operating.

Q.   Okay.  Why -- why do you think that that would prevent you from giving complete or accurate answers?

A.   I don't know how to explain it to you, but I can tell you that it's very uncomfortable to me to be in the middle, you know, of the two sides that I don't want to be involved at all because I know both sides, and I don't -- I want to get out of this situation.

Q.   Okay.  Will you tell me if you give an answer that you think is not complete or entirely accurate?

A.   No.  I can answer you the questions.

Q.   Okay.  If you need to take a break at any time, do you understand that you can

Page 8

request that?

A.   Okay.

Q.   And do you understand that if you take a
break I can ask you who you spoke with if
you spoke with anyone during the break?

A.   Yes.

Q.   And do you know that if you don't
understand something, you can ask me to
repeat it, and we can work with the
interpreter on that?

A.   Yes.

Q.   And you will let us know if you don't
understand something, right?

A.   Yes.

Q.   Do you know what case you're here for
today?

A.   I know some.  I don't know it all.

Q.   So just so we're clear, this is a case with
former employees of Banana Blossom against
Banana Blossom and the owner Jimmy.

A.   Okay.

Q.   I am going to pull a document, our first
exhibit up on the screen.

A.   Okay.

Q.   Can you see this document?

Electronically signed by Raynel Schule (101-061-243-7798)                                    114b321f-1539-47e4-8a60-6c1232727597

A.   Not yet, ma'am.

MS. PHELPS:

Can anyone else see it?

THE COURT REPORTER:

No.

THE INTERPRETER:

Not the interpreter.

THE COURT REPORTER:

No, Hope, I can't see it either.

THE INTERPRETER:

The deponent, the witness, she's not seeing it either.

BY MS. PHELPS:

Q.   Okay.  Can you see the document on the screen now?

A.   Yes.

Q.   Have you seen this document before?

A.   Yes.

Q.   Okay.  And this is your Notice of Deposition for today, correct?

A.   Yes, yes.

Q.   And you requested to give your deposition today instead of on May 26th, correct?

A.   Yes.  Yes.

Q.   Have you brought any documents with you to

Page 10

today's deposition?

A.  No, I did not.

Q.  Is there anyone else in the room with you today?

A.  No, ma'am.

Q.  Okay.  Do you agree not to communicate with anyone else during this deposition by phone, text, email, or any other manner while this deposition is ongoing?

A.  Yes.

MS. PHELPS:

Okay.  I move to attach the Notice of Deposition as "Exhibit 1" to the deposition.

BY MS. PHELPS:

Q.  Okay.  Did you do anything to prepare for the deposition today?

A.  No, ma'am.

Q.  What is your highest level of education?

A.  Elementary level.

Q.  What is your professional working background?

A.  So I was a server, and then I got promoted to become a manager at the Banana restaurant, Banana, yeah, Blossom.

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597

Page 11

Q.   And what is your current job title and --
     and role?

A.   I'm the owner of Chada Restaurant.

Q.   How long have you worked in the service
     restaurant industry?

A.   About 10 years.

Q.   When did you begin working at Banana
     Blossom?

A.   I don't recall.

Q.   Do you remember approximately around what
     year?

A.   If I estimated, it would be around in 2017;
     however, I kind of went back and forth, you
     know, so --

Q.   Back and forth between what?

A.   Meaning that I went to work for another
     restaurant, and then I came back.

Q.   What other restaurant did you work for?

A.   Do I have to answer your question?

Q.   Yes.

A.   Origami.

Q.   When did you become the General Manager of
     Banana Blossom?

A.   I don't remember what year, but I remember
     that's after I returned from Origami.

Page 12

Q.    Have you been the General Manager of Banana
      Blossom since at least 2020?

A.    I am not sure, ma'am.  I don't remember,
      but I think maybe four or five years.

Q.    Okay.  What were your job responsibilities
      as the General Manager at Banana Blossom?

A.    Even though, you know, my title with them
      was the General Manager, but I did not
      have, you know, the authorization without
      consulting with Jimmy first.  Jimmy is the
      owner.  So my, you know, job duties most of
      the time was to order inventories, like,
      order stuff for the restaurant, you know,
      taking care of the employees, the staff,
      dealing with problems, issues, customers,
      customer service, but other than, I don't
      have any authority to make any decision
      without asking Jimmy first.

Q.    Okay.  Before Banana Blossom had you worked
      as a General Manager anywhere else?

A.    No, ma'am.

Q.    And you just said at Banana Blossom you
      reported directly to Jimmy.  Is that right?

A.    Yes.

Q.    Was there anyone else at Banana Blossom

Page 13

that you reported to as well as Jimmy?

THE COURT REPORTER:

It appears that the interpreter froze.

MS. PHELPS:

I'm sorry.  I'll repeat.

BY MS. PHELPS:

Q.   Other than Jimmy, was there anyone else you reported to at Banana Blossom?

THE INTERPRETER:

Thank you.  I apologize.  I lost my connection.

THE WITNESS (Through the Interpreter):

Yes, ma'am.

BY MS. PHELPS:

Q.   Who -- who else was there?

A.   No.  Jimmy was the only -- the only owner.

Q.   Okay.

A.   So think about this restaurant as a family-owned business, ma'am.  You know, so everything is done, like, one person, you know, as an owner does it all, did it all. So it's more like that.  It's -- it's not, like, a big corporation or anything like

Page 14

that.

Q.   Did you know Jimmy before you worked with him at Banana Blossom?

A.   No, ma'am, I did not.

Q.   Okay.  How did you get hired at Banana Blossom?

A.   Through a friend.  My friend went there first.

Q.   Who -- who is the friend who went there first?

A.   Well, it was a friend, and then we met in Connecticut -- Connecticut, we worked together, and then we moved, you know, but right now, we're sort of separated.  We go -- we went our own separate ways.  Her name is Ploy (phonetic).

Q.   Did Jimmy have the final say with regard to all pay policies?

A.   He took care of it all, ma'am.

Q.   And Jimmy was the owner the entire time you were there, right?

A.   Yes, ma'am.

Q.   And all decisions about pay and tip pooling were carried out per Jimmy's decision?

A.   Yes, ma'am.

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597

Page 15

Q.   There's no one else who had authority to decide pay policies other than Jimmy?

A.   No one else.

Q.   At Banana Blossom once you became the General Manager were you paid on a salary basis?

A.   Salary.

Q.   Do you remember how much salary you were making at the end when you left Banana Blossom?

A.   Per month, ma'am?

Q.   Was it monthly or annual?

A.   Well, monthly, ma'am, I would say about $4,400, and that's before tax, a month.

Q.   I'm going to pull up another document.  Can you see the document on the screen?

A.   Yes.

Q.   Have you seen this document before or others like it?

A.   I'm not sure, ma'am.

Q.   Okay.  Did you ever see the -- the payroll for Banana Blossom?

A.   I am not sure, ma'am, because most of the they will sent it to their CPA.

Q.   So Jimmy would send the payroll to the CPA,

Page 16

and you wouldn't see it before that?

A.   Right.  So how it worked was that, you know, he would collect the number of hours that the staff or the employee reported to me, and then, you know, I will give him those information and then he would just took care of -- he would just take care of the payroll himself.

Q.   Okay.  All right.  So I'll represent to you --

A.   I don't know how to -- how to explain it to you, you know, clearly.  I would say that I saw something like this before a few times, but because there's no system, you know, management system.  So I don't know how to explain that.

Q.   Okay.  So I'll represent to you that this is the July 2024 payroll, and looking at on the line for your name, does this appear correct salary amount of 4,400, and that there's nothing in the column for tips?

A.   Yes.

          MS. PHELPS:

          Okay.  We'll attach this as "Exhibit 2."

Page 17

BY MS. PHELPS:

Q.   Okay.  I have another document.  Okay.  Can you see this document?

A.   Huh-huh.

Q.   Okay.  Let me scroll.  Have you seen this document or others like it before?

A.   Yes, I have.

Q.   Okay.  So you understand this is your paycheck stub for the July 2024 pay period, correct?

A.   Yes.

Q.   Okay, and these are the standard paycheck stubs for Banana Blossom, right?

A.   Yes, huh-huh.

Q.   And there's no line on here for reporting tips for salaried employees on your check.  Is that right?

A.   Yes.

Q.   Okay.

          MS. PHELPS:

          Okay.  We'll attach this as "Exhibit 3."

          THE WITNESS:

          Okay.

BY MR. PHELPS:

Page 18

Q.  All right.  I have another exhibit.

A.  Okay.

Q.  Okay.  Can you see this document?

A.  Yes.

Q.  Okay.  Have you seen this document or others like it before?

A.  I have, yes.

Q.  And this is a shift schedule for Banana Blossom, correct?

A.  Yes.

Q.  And this schedule shows your name on the side for -- for some server shifts.  Is that right?

A.  Yes.

Q.  And sometimes you -- you did work as a server at Banana Blossom while you were also the General Manager.  Is that right?

A.  Yes.  Only sometimes though.

Q.  Okay.  Was it sometimes over a period of years or only during a certain time?

A.  Sometime I would say.

Q.  Sometime during the whole time that you were General Manager or only during a certain year?

A.  I don't remember.

Electronically signed by Raynel Schule (101-061-243-7798)

Page 19

Q.   Okay.  Why did you work shifts as a server
sometimes?

A.   As far as I know, you know, sometime the
lack of staff, you know, for serving, and
you know, how sometime the servers, they
have to take off too, and, you know, they
had things that they had to do, and there's
no one else to cover the shift, so I had to
do it.

Q.   So did you end up working server shifts
maybe once a week or once a month or less
often than that?

A.   I don't remember.

Q.   And when you worked as a server, you
received tips from the tip pool, correct?

A.   Yes.

Q.   And I have some questions about how the tip
pool at Banana Blossom was structured.

A.   Yes.

Q.   And was this tip pool ultimately Jimmy's
decision?

A.   Jimmy did.

Q.   Okay.  Okay.  So all of the tips that were
received from tables during a shift were --
were pooled together.  Is that right?

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597

Page 20

A.   Yes.

Q.   And then a flat percentage most recently around the time you would have left two percent was taken out to go toward a credit card fee.  Is that right?

A.   I'm not sure how many percent actually -- exactly, sorry, exactly.  Yeah?

Q.   Okay, but a credit card fee was taken out, right?

A.   Yes, but there were times, though, that they stopped doing that.  So I don't know what -- at what time you know.

Q.   And then after that, ten percent of the remaining pool was taken out and divided amongst the kitchen staff.  Is that right?

A.   Yes, ma'am.

Q.   And then five percent of what remained in the pool was divided between the host and bussers.  Is that right?

A.   Yes.

Q.   And then the servers and expediters would get even shares of the remaining tip pool?

A.   Yes.

Q.   In a typical weekend night, there were four servers and two expediters.  Is that right?

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597

Page 21

A.   I am not sure, ma'am.  Something like that.

Q.   Okay.  Okay, and what about a lunch shift, were there usually two servers and one expediter?

A.   Yes.

             MS. PHELPS:

             Okay.  All right.  We'll attach the shift schedule as "Exhibit 4."

BY MS. PHELPS:

Q.   All right.  I have another document to show you.  Okay.  Can you see the document on the screen?

A.   Yes.

Q.   And this is a photograph of the -- the tip pool.  Is that right?

A.   Yes.

Q.   Okay, and these are tip pools you see for the date for June 17th, June 18th, and June 20th.  Is that right?

A.   Yes.

Q.   Okay.  Have you seen these kind of tip pools, the math, these notebook pages before?

A.   Yeah.  Yes, I have.

Q.   Okay.  I have some questions about how the

-- the tip out, these records were kept.

A.   Okay.

Q.   So pages like these were filled out in composition notebooks by a server at the end of each shift.  Is that correct?

A.   Yes.

Q.   Were you ever the person who filled out the pages in these notebooks?

A.   Yes, I have, but just very, very rarely.  I would say for the whole entire time, maybe once or twice.  Like I said again, I did not have the authority to take care of the money or the payment at all.

Q.   So usually it was one of the -- the other servers who would fill out these records in the notebook?

A.   Yes.

Q.   Okay, and each -- each page is split in two with lunch at the top and dinner at the bottom.  Is that right?

A.   Yes.

Q.   Okay, and at the top of each page is the date.  Is that right?

A.   Yes.

Q.   Okay.  All right.  The first largest

Page 23

number, so if we're looking at the first page here for June 17th, 2025, the first largest number, 384, that is the entire tip pool, correct?

A.   Yes.

Q.   And then the second line that -- or the first line, that usually counts for the ten percent given to the kitchen, the amount given to the back of the house.  Is that right?

A.   Yes.

Q.   Okay, and then another line that accounts for the amount of tips given to the host or busser?

A.   Yes.

Q.   And the final line, that would demonstrate the amount of money left in the tip pool to be divided evenly between the servers and expediters?

A.   Yes.

Q.   And that list of names on these lines includes the servers and expediters in the tip pool.  Is that right?

A.   Yes.

Q.   Okay.  So, for example, on this shift when

Page 24

you were a server includes your name at the end?

A.   Yes.

Q.   Were these composition notebooks the only place the tip out was recorded?

A.   Yes.

Q.   And employees used the notebook until they ran out of pages, and then they moved on to a new notebook.  Is that right?

A.   Yes.

Q.   Okay, and only the active notebook was kept at Banana Blossom.  Is that right?

A.   I don't know.

Q.   Do you know who has the past notebooks?

A.   Oh, I don't know.

Q.   What happened once a notebook was completely filled up?

A.   I don't know, ma'am.

Q.   Who -- do you know who primarily handled the notebooks?

A.   The servers.

Q.   Okay.  So one of the other server employees would have been responsible for turning the notebook in at the end?

A.   Yes.

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597

Page 25

Q.    Okay.  Do you have any reason to believe that the tips you received were reported anywhere other than this -- in this notebook or any of these notebooks?

A.    Can you ask me again.

Q.    Yes.  Was the amount of money you received from the tip pool written down anywhere other than in these notebooks?

A.    I don't think so.  Because it's always a server, like, one of the servers who took care of it, so.

Q.    Did you personally write down the amount of tips you received from your server shift anywhere to keep a record?

A.    No, because it was not my main job, you know, it's not that much.  Well, and I did not want to do it at all.  Actually I did not want to cover, you know, for the servers who, you know, had to go somewhere, take off, took vacations, but I had to do it, and it seems like it has already been agreed before I had to do it, yeah.

Q.    Okay.  Okay.  So is it Jimmy who decided that you would take those shifts, and that's why you had to do it?

Electronically signed by Raynel Schule (101-061-243-7798)                                        114b321f-1539-47e4-8a60-6c1232727597

Page 26

A.   No, but it's more like, you know, they talk amongst the servers that they were about to, like, take off, and then they came to me after they made a decision and asked me to do it so, but regardless of that, any -- anyone had to report to Jimmy first.  Like, who's going to take off, who's going to do it.

Q.   And Jimmy could have hired another server, correct?

A.   I honestly don't know really.  I -- I don't know.  Like, I mentioned, you know, before it's true that, you know, my title was a GM, but I did not have a lot of authorization or any, you know, authority to make any decision at all so --

Q.   So Jimmy was the only person with the authority to hire or fire employees like servers?

A.   Yes.

Q.   When you received tips from the tip pool, were those cash, credit card tips paid later, or a combination?

A.   It's always cash, you know, for every staff before they go home after the shift every

Page 27

night.

MS. PHELPS:

Okay.  All right.  We will attach this tip out record as "Exhibit 5."

BY MS. PHELPS:

Q.   Okay.  On May 2nd, 2025, were you present for a meeting with Jimmy and some of the Banana Blossom employees?

A.   I don't remember.

Q.   Were you present in May 2025 at one or more meetings where employees met with Jimmy about issues with their pay, the pay structure?

A.   I was present.  I don't remember what date.

Q.   Okay.  At one of the meetings, did the employees tell Jimmy that -- that the pay structure at Banana Blossom was unusual in comparison to other local restaurants?

A.   I am not sure, ma'am.  I don't remember, ma'am.  Maybe there was a topic of discussion, you know, related to your question.  I -- I don't remember.

Q.   From what you heard and remember at these meetings, did you understand that employees were making complaints to Jimmy about their

Page 28

pay?

THE INTERPRETER:

I'm so sorry, Miss, could you please repeat that.

MS. PHELPS:

Yes.

BY MS. PHELPS:

Q.   From what you heard at these meetings and that you remember, did you understand that employees were reporting complaints to Jimmy about their pay?

THE INTERPRETER:

Thank you.

THE WITNESS (Through the Interpreter):

Oh, yeah, there was a complaint, yes.

BY MS. PHELPS:

Q.   Okay.  Did you understand that they were telling Jimmy that some of the ways they were paid were illegal?

A.   Yes; however, for me I don't understand the law.  I don't know how it's related to the issues raised so -- yeah, for me, I don't understand how it's related but --

Electronically signed by Raynel  Schule (101-061-243-7798)                                      114b321f-1539-47e4-8a60-6c1232727597

Page 29

Q.   Did you have any conversations with Jimmy
     before or after the meeting about what the
     employees said?

A.   No, ma'am, not on that date.

Q.   Did you have meetings with him about the
     topic of discussion on a different date?

A.   I'm going to have to say that I'm not --
     not sure, okay, but just to answer your
     question, right, so after the issue was
     being raised and told, of course, you know,
     Jimmy came to me and talked about it the
     other day, right, about it, you know, so he
     had his complaint, and he shared that with
     me.  Of course, you know, there were times
     when -- when we have arguments or
     disagreements, and, you know, I suggested
     my opinion, like, to him that maybe you
     could have done this or that, but
     ultimately, though, it's all up to him to
     make a decision.  It's still going to be
     him anyway so.

Q.   What did Jimmy share with you, and what was
     your suggestion?

A.   Pertaining to the issues?

Q.   Yes, the issues with the pay.

Electronically signed by Raynel Schule (101-061-243-7798)                                    114b321f-1539-47e4-8a60-6c1232727597

A.   Right.  So there was complaint particularly about removing, you know, the tip pool from the kitchen, and I suggest that he did that, but, you know, it's up to Jimmy anyway so --

Q.   After the meeting, did Jimmy begin making new restrictions or rules for front-of-house employees?

A.   Yes, there was, but I don't remember because I left that place long time ago so --

Q.   Did he speak with you about it before he imposed any of these new rules?

A.   Well, I was more like on the receiving end. So he would say, you know, a lot of things he shared, right, things with me, but I don't have -- I -- I couldn't make a decision.

Q.   Did he require employees to come in earlier for -- for shifts and threaten termination if they were more than five minutes late three times?

A.   I don't remember.

Q.   Did he make the employees, the front-of-house employees keep their cell phones in a

cell phone box?

A.   I don't remember, ma'am.

Q.   Did he revoke shift meal benefits for front-of-house employees three nights a week?

A.   There would be, you know, food provided for the lunch shift, but I don't remember whether, you know, he removed that off or --

Q.   Did any Banana Blossom employee report complaints to you directly about the pay policies?

A.   No, ma'am.

Q.   Okay.  I'm going to share a screen shot on the screen.

A.   Overall, ma'am, I -- I don't remember lot. It has been while.

Q.   I don't -- that's -- that's an okay, you know, response if you actually don't remember.  And that's also why we have some of these documents on the screen as well and so you can refer to them and refresh your memory.

A.   Okay.

Q.   Can you see the document on the screen?

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597

Page 32

A.   Yes.

Q.   And have you seen this document, screen shot, text exchange before?

A.   Yes, that was a message sent, right.

Q.   And this is a group chat between you and front-of-house employees, and the date is May 4th.  Is that right?

A.   Yes.

Q.   And in -- in the message you sent, you prohibited one of the servers, Connor, from picking up anyone's shifts.  Is that right?

A.   Yes.

Q.   Okay, and why did you issue that prohibition in the chat?

A.   Oh, Jimmy ordered it.

Q.   Okay.

A.   Yes.

Q.   And did Jimmy explain to you at all why he ordered you to do that?

A.   No, ma'am.

Q.   After this text was sent, were you present at another meeting between Jimmy and the employees where he gave them a letter from his attorney?

A.   I don't remember.

Page 33

Q.   Did you ever have any conversations with Jimmy after this about the pay or letter he had gotten from his attorney?

A.   From the attorney to the staff, no.  No, I don't remember.

MS. PHELPS:

Okay.  And we'll attach this as "Exhibit 6."

THE WITNESS:

Okay.

BY MS. PHELPS:

Q.   I have another one.  Okay.  I have another document on the screen.  Okay.  Can you see this document?

A.   Yes, huh-huh.

Q.   And have you seen this text exchange before?

A.   I have.

Q.   And these are group texts in a chat called Permanent BB.  Is that for Banana Blossom?

A.   Yes.

Q.   And this screen shot shows that on May 12th, 2025, you responded to Connor that he couldn't pick up shifts.  Is that right?

A.   Yes.

Page 34

Q. And your text says, "No you can't Connor. I think I'm very clear you can't pick up any more shifts except your regular." Is that right?

A. Yes.

Q. And when Connor asked for clarification, you responded, "I don't need to answer why." Is that right?

A. Yes.

Q. And then you left this group chat. Is that right?

A. Yes.

Q. Why did you leave the group chat?

A. Well, because Jimmy was not included in this group chat, so I, you know, removed myself from this particular group chat, the discussions. I think, it is better, you know, whenever there's communication that Jimmy was in a chat that I would be in, yeah.

Q. Did you have any conversations with Jimmy about this text exchange and Connor's responses?

A. I mean, I did. You know, I told him, but I don't remember.

Page 35

Q.   Do you remember what his response was?

A.   No.  Yeah, I don't remember, but it may be something, like, you know, he told me not to answer anymore.

MS. PHELPS:

And we'll attach this as "Exhibit 7."

BY MS. PHELPS:

Q.   Okay, and this is the last exhibit I'm going to put up on the screen.  Can you see this document?

A.   Yes.

Q.   Okay, and have you seen this text exchange as well as the doc -- the photograph in it as well?

A.   Yes.

Q.   Okay, and is this a group text between you, Jimmy, and Asada (phonetic), Ace Simpson?

A.   Yes.

Q.   And this screen shot shows Jimmy sending a photograph of what's called a chopping block list to Ace on May 4th, 2025, correct?

A.   Yes.

Q.   Okay, and after sending the list, Jimmy

Page 36

tells Ace, "You are # 5 just to be exact #killbill."  Is that right?

A.   Yes.

Q.   Had you seen this list before Jimmy sent the photo in the chat?

A.   Never.  I saw at the same time Ace saw it.

Q.   Did you have any conversations about this list with Jimmy?

A.   No, no, ma'am.  No, ma'am, and truthfully this is silly.  This is -- this is quite a silly list.  I -- I don't even pay attention outside of my work.

Q.   And I'll ask this question.  What did you think about this photograph of this list when you received it in this chat?

A.   I think it's nonsense.

Q.   Why do you think that Jimmy sent it to Ace?

A.   I have no idea.

Q.   And you said earlier that you're unfamiliar with the law.  Are there any of Banana Blossom's business practices that you knew of that you knew were in violation of the law?

A.   I don't know.  I did not know in depth of what, you know, Jimmy operates or his

Electronically signed by Raynel Schule (101-061-243-7798)                                              114b321f-1539-47e4-8a60-6c1232727597

Page 37

business was.  Like I said, I had a job.  I did whatever the job asks me to do just like any other employee or staff, and I did not want to, you know, do more.  I don't know more than my job.

Q.  Were there any business practices at Banana Blossom that you felt uncomfortable with?

A.  No, ma'am.  I mean, at that time when I was hired, you know, I tried to cover my job.  You know, whatever he told me to do, I followed through.  After the job was done, I went home.  I picked up my salary.  How am I going to put this, but if you ask me, right, so just from my perspective, I was there to make money, and I tried to avoid any issues or anything at all that would put me in an uncomfortable situation.  So I tried to stay out of it, because my main purpose of working there is to support my family for making income.  So you know, I tried to stay out of problem.  I worked; I got paid, so, you know, yeah.

Q.  Is there anything Jimmy did that you knew was illegal?

A.  I do not know.

Electronically signed by Raynel Schule (101-061-243-7798)          114b321f-1539-47e4-8a60-6c1232727597

Q.    Is there anything Jimmy asked you to do that you knew was illegal?

A.    No, no, ma'am, because I don't know what's legal or what's not.  So at that time also whatever, you know, he asked me to do, I couldn't yeah, identify which -- which is illegal, which is not.  I really don't know.

Q.    So you relied on Jimmy as the business owner to know what was a legal and illegal business practice in a restaurant.  Is that right?

A.    That's right.

                MS. PHELPS:

                Okay.  We'll attach this as

            "Exhibit 8."

BY MS. PHELPS:

Q.    And those are all my questions for you today.  I understand this is uncomfortable. I appreciate your time, and thank you for being here.

A.    Thank you.

Q.    All right.  Thank you-all and court reporter, we can go off the record now.

                (Whereupon, the taking of the

Page 39

witness' testimony was concluded.)


C E R T I F I C A T E

THIS CERTIFICATION IS VALID ONLY FOR A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS PAGE.

I, RAYNEL E. SCHULE, Certified Court Reporter, #77005, in good standing, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that KULISARA JINAWONG, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 38 pages; that this testimony was reported by me in stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the Board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the Board; that I am not of counsel, not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.


6-15-2026    _____
Date                  Raynel E. Schule, CSR
                      Certified Shorthand Reporter
                      State of Louisiana

Electronically signed by Raynel Schule (101-061-243-7798)                    114b321f-1539-47e4-8a60-6c1232727597